DAVE W. RUTHERFORD V. THE STATE.

No. 9694.  Delivered April 14, 1926.

Motion for rehearing withdrawn by State, May 5, 1926.

**1.—Murder—Charge of Court—Arrest Without Warrant—Erroneously Submitted.**

Where, on a trial for murder, the defensive theory of appellant being that he killed deceased in defense of himself against an unlawful arrest, it was error for the trial court in the absence of testimony warranting its submission, to give in his charge Art. 215 C. C. P. 1925, relating to the right of an officer to arrest without a warrant where the offender is about to escape and there is not sufficient time to procure a warrant.   This proposition is illustrated in the case of Cortez v. State, 83 S. W., 814.

**2.—Same—Continued.**

In the present instance, the record is void of any evidence that before

attempting the arrest, the officers had information from any source that the appellant was about to escape. Such facts as form the basis of the theory of escape occurred after the officers had decided to make the arrest of appellant without a warrant, and without any effort to procure a warrant, although both time and means were available.

### 3.—Same—Evidence—Properly Admitted.

The testimony of Mrs. Ragedale as to statements made by her to deceased, that she had seen appellant an hour or so before the homicide, walk through an alley behind her house and on investigation that she had found a bottle of whiskey in the alley, hidden behind a plank, was properly received, same having a bearing upon his state of mind, and if true, was a matter within appellant's knowledge, and whether or not true was for the jury to determine.

### 4.—Same—Argument of Counsel—Held, Improper.

The argument of the district attorney giving an estimate of the character and conduct of the deceased, based upon his personal knowledge, and experience went beyond the scope of legitimate debate; also the remark of one of state's counsel that the defendant had not put his reputation in issue, and the argument about "tearing the court house down," etc., were improper. Under some circumstances, improper argument becomes serious in their consequences. See Stiles v. State, 239 S. W. 965, and other cases and authorities cited.

#### ON REHEARING BY STATE.

### 5.—Same—Motion Withdrawn.

Since the filing of its motion for a rehearing hereon, the state has filed a written request asking that it be permitted to withdraw said motion for rehearing, and the motion to withdraw same is granted.

Appeal from the District Court of McCulloch County. Tried below before the Hon. J. O. Woodward, Judge.

Appeal from a conviction of murder, penalty life imprisonment in the penitentiary.

The opinion states the case.

*W. Marcus Weatherred* of Coleman, *J. E. Shropshire* of Brady and *Newman & McCollom of Brady,* for appellant.

*W. V. Early,* District Attorney, *Critz & Woodward,* Special Prosecutors.

*Sam D. Stinson,* State's Attorney, and *Robert M. Lyles,* Assistant State's Attorney, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder, punishment fixed at confinement in the penitentiary for life.

About ten o'clock at night on the 16th of February, 1924, the deceased, J. H. Griffith, a deputy sheriff, received a gunshot wound from which he afterwards died. The wound was inflicted by the appellant who, after shooting Griffith, fired several shots at Conley, a constable who was with Griffith. Several shots were fired by Griffith at the appellant and he was wounded. The tragedy occurred in an alley in the business portion of Santa Anna, a town of about 1,500 inhabitants. Ragsdale and wife were residents of Santa Anna, their dwelling-place being at a different part of the town some distance from the business center where the homicide took place. Mrs. Ragsdale testified that in the afternoon, at about five or six o'clock, she saw the appellant walk through an alley which was adjacent to her premises. As we understand the record, there was a garage in the back of the Ragsdale premises, the garage bordering on the alley, abut sixty-five feet from the part of the dwelling at which Mrs. Ragsdale claims to have stood. She was not acquainted with the appellant but knew him by sight. According to her testimony, as the appellant passed through the alley, the garage obscured him from her view. It was some five or six minutes after she lost sight of him until she saw him again. After he had passed through the alley, she found a bottle of whiskey behind a plank which was nailed to the side of the garage. She took the bottle to her house, first putting it in a dresser drawer and later in her stove. Some ten or twenty-five minutes after appellant had passed through the alley, she saw three Mexicans pass through it. They remained in the alley for some five or six minutes. She said the bottle of whiskey was in plain view of anyone traveling east. She disclaimed seeing the appellant deposit the whiskey or seeing anything in his possession; nor did she see anything in the possession of the Mexicans mentioned. She had not previously on that day been in the alley. She reported the matter to her husband, and about 8:35 o'clock in the evening she related it to the deceased, Griffith, what she had seen. Griffith got out of her stove the bottle of whiskey which she had deposited there. She did not detail the conversation between herself and Griffith, further than to say that "I told him who I saw coming down the alley and he asked me if there was anyone else, and I told him there were three Mexicans." The husband of Mrs. Ragsdale testified that he heard the conversation between the deceased and Mrs. Ragsdale. He said:

"* * * and she just told him about what happened at the

house—said Dave Rutherford came by and after he went by she went out there and got this bottle and taken it in the house; that she got it right down by the side of the garage, behind a plank."

From Conley's testimony we learn that after Griffith received information from Mrs. Ragsdale, the witness, in company with Griffith, went into the alley where the horse and buggy were situated. They concluded to return and search the buggy. When they returned, appellant and Shelton had gotten into the buggy and started to leave. As the appellant entered the alley, Griffith remarked: "I think we ought to arrest him. What do you think?" The witness replied: "I would arrest him." Called by the deceased, appellant got out of his buggy and went back to meet him while Conley went to the buggy. Appellant and deceased conversed in low tones. The witness understood no words except that he heard deceased say: "Now, don't go off, Dave." Appellant's hands were in front of him. The hands of the deceased were at his side.' The deceased grabbed at the appellant's pistol, but it was discharged before the deceased touched it. The witness then ran towards the combatants and was shot by the appellant, one bullet entering his clothes and another his leg. Deceased, in the meantime, was firing at the appellant.

On August 3, 1923, antecedent to the homicide, appellant had been arrested by the deceased. There was evidence that at that time the appellant was intoxicated. There was also evidence that the deceased, while he had been designated as a deputy sheriff, he had not qualified as such, though he had previously been city marshal. A difficulty took place which resulted in the prosecution of the appellant for an assault and his conviction upon a plea of guilty, he having wounded the deceased with a knife. There was evidence that subsequent to that time appellant had said that if the deceased undertook to arrest him again, he would be killed. At the time of the homicide and for a long time prior thereto, J. J. Gregg was a Justice of the Peace of the precinct. He resided a short distance from the business portion of the town of Santa Anna, maintaining an office in the town. He was editor and publisher of the local newspaper. According to his testimony, he was in town on the night of the homicide and was in his office both before and after the evening meal; that it was his custom to attend a picture show in its first performance and he may have gone there on the night in question. No application was made to him for any warrant of

arrest. His office was about 200 feet from the place where the tragedy took place. He was a witness to the occurence on August 3, 1923, and described the encounter, saying in substance that upon hearing a disturbance he went there and saw the appellant down on the sidewalk with the deceased having his knee on the appellant's head or neck and holding his hand. A few moments later he saw the deceased strike the appellant, who at the time was a prisoner. The witness protested and threatened to arrest Griffith if he repeated the blow. From his testimony, the deceased was aware of the fact that the witness was a Justice of the Peace and had frequently had official business with him.

Appellant introduced testimony to the effect that a month or more subsequent to the encounter mentioned, deceased had said that he and the appellant had had trouble and "the next time me or Conley go after him, we are going to kill him." The witness said: "Don't do that; it will get you in trouble." Deceased replied: "No, I have got my deputy papers so it won't go hard on me." That similar threats had been made at different times was given in the testimony of several witnesses, namely, McBee, Crider, Croft, Harrison, Hinds and Shields. There was some evidence of reconciliation.

In rebuttal, the state proved additional threats of the appellant to kill the deceased; also expressions of ill will.

There was expert testimony, pro and con, based upon the difference in the report of the pistols, bearing upon which was fired first. From the appellant's testimony, we take the following:

"Just prior to the shooting, before I went into the alley, I went to the barber shop to get Walter Shelton to let's go home. I asked him if he was ready to go home, and he said, 'Yes, let's go home,' and we walked out on the sidewalk. * * * He was kinder rolling a cigarette, and were walking along leisurely to the alley and went on to the buggy. I saw Mr. Griffith as I went in the alley; he was standing drinking soda-water at the little hamburger joint.

"I did not have any whiskey that day at all; there was no whiskey in my buggy. I did not go in the alley by Mrs. Ragsdale's house at all that day; I didn't put a bottle of whiskey there by her garage. I didn't know anything about any whiskey. * * * Walter Shelton untied the horse. We got in the buggy. After I got in the buggy, I had gone, I suppose, about eighty feet, going east, in the direction of my home. I had started

home. * * * I heard Uncle Joe Griffith, and I looked around, and he put his hand up (indicating) and I got out and went to see what he wanted. * * * Mr. Griffith told me not to hurry off, to stay in town a little longer until Mr. Pauley got down there. I asked him what for. He told me he had a case of transporting whiskey against me, and I asked him if he had a warrant for my arrest, and he said, 'No.' Then I just turned around and started on back to my buggy, to go home. As I got near the buggy Uncle Joe was walking along kinder with me, * * * and as I neared the buggy, within eight or ten feet, he says, 'Don't you attempt to leave town—if you do me and Conley is going to kill you.' I says, 'Don't do that, Uncle Joe.' I had heard threats and things, that they were likely to kill me. I says, 'Don't do that, Uncle Joe; you have got no right to hold me by force.' * * At that point he began pulling his gun, and about the time I turned to look at him that way, he was about ready to fire. * * * I ran my hand in my pocket and pulled my gun out; I didn't get it more than about this, (indicating) until he fired and hit me right here (indicating) on trousers. * * * I saw he was going to fire and felt that my life was in danger; I didn't know whether to try to run, I thought possibly he would shoot me as I tried to run, and I pulled my gun, as he fired. * * * When I fired Uncle Joe staggered back and I thought he went down to the ground. * * * I turned to see where Conley was at and he was to the right of the buggy, kinder crouched, and I thought he was pulling a gun from his scabbard, and I shot him twice as quick as I could shoot, because I felt that my life was in danger; I thought he was fixing to shoot me."

Appellant introduced the testimony of several witnesses to circumstances going to support his testimony that he had no whiskey and that he was not in the alley mentioned by Mrs. Ragsdale. The State, in rebuttal, introduced the dying declaration of the deceased, from which we quote:

"Dave Rutherford was in the back alley last night about 10 o'clock with Shoat Shelton. W. S. Conley and I went over there together. I called them to stop—was about 20 steps from them when I called. Dave got out of the buggy and came meeting me—Conley went on to the buggy, and Will Conley said, 'I have nothing to do with it.' Dave walked up to where I was, and I said, 'Dave, you consider yourself under arrest.' He asked me what I was arresting him for, and I told him for transporting whiskey, and he and I started to walk toward the buggy; when we were in about 10 feet of the buggy, he drew a pistol from

his overcoat pocket and wheeled and shot me. I did not have my gun out at that time and was making no effort to get my gun and was not expecting him to shoot me. He just shot at me one time, hitting me in the bowels, and then whirled and went to shooting at Bill Conley, and then I pulled my gun and went to shooting him (Dave Rutherford.) I fired four shots at him and at the last shot he fell. He was shooting at Conley all the time I was shooting at him. I do not know how many shots he shot at Conley. * * * I had heard that Dave Rutherford had brought some whiskey to town and was told so by Mrs. W. H. Ragsdale; and Mrs. Ragsdale told me she saw Dave Rutherford hide this whiskey behind her home in the alley. * * *"

The State introduced Windham, an eye-witness, whose testimony tended to support the state's theory that the appellant fired first. Appellant introduced Cherry, an eye-witness, whose testimony tended to support the appellant's theory that the deceased first fired. Several witnesses testified that both the deceased and the appellant were seen about the town a number of times during the evening. They both seemed to be about the business portion of the town.

The statute, Art. 215, C. C. P., 1925 (Old Code, Art. 262), reads thus:

"When it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."

Paragraph 9 of the court's charge is practically a reproduction of the statute mentioned, and upon supporting facts would not be inappropriate. The purpose of the statute is to give effect to the guaranty of the Bill of Rights against the unreasonable seizure of the person, and to safeguard the public in the apprehension of offenders whose escape would be effected if a warrant is imperative. It is the information that an escape is imminent which dispenses with the necessity of a warrant of arrest. When it is *shown* to the officer in the manner prescribed in the statute that an offense has been committed by the person designated, it is the duty of the officer to get a warrant unless he knows or is advised that the offender is about to escape and there is no time within which to procure a warrant. It is true that the law does not demand that the officer possess superhuman foresight, nor that he do more than what comports with reason, taking into account the emergency of the occasion. This

is illustrated in Cortez v. State, 83 S. W. Rep., 814. The law does demand, however, that the restrictions of the statute be in good faith observed and be not wilfully ignored or captiously disregarded. In the present instance, the record is void of any evidence that before attempting the arrest, the officer had information from any source that the appellant was about to escape. Such facts as form the basis of the theory of escape occurred after the officers had decided to make the arrest of the appellant without warrant, and while they were in the act of attempting the arrest, and it may be added that the attempt appears to have been made without an effort to procure a warrant, although both time and means were available. The conversation with Mrs. Ragsdale in which she related to the officer the circumstances touching the appellant's conduct in the alley and the finding of the whiskey occurred more than an hour, and probably an hour and a half before the arrest was attempted. During all of that time the appellant was in town, and was seen by various persons, including Conley, who aided the deceased in attempting the arrest. Appellant's vehicle was located in the public alley in the business part of the town. It appears that it had been there for a number of hours and had been seen by both Griffith and Conley. Appellant lived with members of his family a short distance from the town. After the conversation with Mrs. Ragsdale, they determined to search the buggy. When they returned to search it, they observed the appellant and Shelton about to drive away. When they were hailed by the deceased, they made no effort to continue their journey. The deceased was on foot. Appellant stopped his buggy and returned to talk with the deceased. Conley, in the meantime, went to the buggy, and seems to have been at or near the horse at the time the shooting began. Appellant's conduct, prior to the shooting, viewed in the strongest light favorable to the State, seems to have been a determination to oppose an arrest without a warrant, and so far as we are able to judge, his conduct portrayed no semblance of escape as that term is used in the statute in question.

It is doubtful whether the facts within the knowledge of Mrs. Ragsdale and which she reported to the deceased were of sufficient cogency to *show* that the appellant had unlawfully transported whiskey. The deceased, in his dying declaration, said that Mrs. Ragsdale had told him that she had seen the appellant put a bottle of whiskey in the alley. This could do no more than show the version of the deceased of Mrs. Ragsdale's statement.

It was in conflict with her testimony and that of her husband in that she did not claim to have seen the appellant in possession of whiskey or anything. She does not claim to have known how long the whiskey which she found in the alley had been there. She specifically disclaims any knowledge upon that point and declares that she saw nothing in the hands of the appellant. Her relation of the occurrence presents but a series of circumstances which possibly may have been of sufficient cogency to justify an affidavit seeking a warrant for arrest, but of doubtful sufficiency supporting the offense of transporting intoxicating liquor.

Under the facts before us, it is believed that by embracing in the charge the theory of lawful arrest and escape, which occurred in several paragraphs thereof, there was error committed prejudicial to the appellant. Due exception was reserved and the propriety of the instructions is before this court for review.

The record is voluminous, there being some seventy bills of exception. The impracticability of a detailed discussion is manifest. The fact that appellant had been charged with a felony subsequent to the tragedy was properly received upon the issue of his credibility as a witness. Violations of the so-called Volstead Act, under certain circumstances, may be classed as felonies.

The testimony of Mrs. Ragsdale was not, in our judgment, improperly received. There was evidence that the deceased and appellant were enemies; that they had had previous difficulties over the arrest of the appellant; that they had made mutual threats, some of which were conditioned upon an arrest or attempted arrest. The present transaction grew out of an attempt of the deceased to arrest the appellant. The information received by the deceased from Mrs. Ragsdale essentially bore upon his state of mind. If, in fact, Mrs. Ragsdale related the truth, it was a matter within the appellant's knowledge, and bore upon his mind at the time of the tragedy. Whether it was true was a matter for the jury to determine.

Touching who was the aggressor of the tragedy, the evidence is in sharp conflict. Whether the deceased, in his conduct, was actuated by malice or by a misconception of his official duty, and whether the appellant fired with malice or in self-defense or in resisting an arrest unlawfully undertaken and pursued, were controverted questions. It was permissible that the jury know of relevant facts tending to illustrate the motives of the parties and calculated to enable the jury to determine the issues prop-

erly before them. Thus, the antecedent threats, difficulties and expressions of ill will were properly received in evidence.

In giving an estimate of the character and conduct of the deceased, based upon his personal knowledge and experience, the district attorney perhaps went beyond the scope of legitimate debate. See Stiles v. State, 239 S. W. 965; Branch's Ann. Texas P. C., Sec. 364. As much may be said of the remarks of one of State's counsel in relation to the fact that the appellant had not put his reputation in issue. See Wright v. State, 60 Texas Crim. Rep. 387; Patterson v. State, 87 Texas Crim. Rep. 95. The same is true concerning the argument about "tearing the court house down," See Coats v. State, 265 S. W. 981; Pemberton v. State, 55 Texas Crim. Rep. 464; Michie's Ency. Digest of Texas Rep., Vol. 1, p. 439. These matters are mentioned not as a reason for reversal, but to suggest that upon another trial counsel refrain from such remarks. Under some circumstances improper arguments become serious in their consequence.

For the reason that the question of legal arrest of the appellant was submitted to the jury in the absence, as we conceive, of evidence supported such issue, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—Since the filing of its motion for a rehearing herein, the State has filed a written request asking that it be permitted to withdraw said motion for rehearing.

The motion is granted.

*Motion withdrawn.*