James Francis FRY, Appellant,

v.

The STATE of Texas, Appellee.

Jimmy Rincon MARTINEZ, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 61122, 61123.

Court of Criminal Appeals of Texas,
Panel No. 1.

June 9, 1982.

On Rehearing Oct. 6, 1982.

Tom S. McCorkle, Dallas, for appellant.

Henry M. Wade, Dist. Atty., Karen Chilton Beverly, C. Wayne Huff and Will Wilson, Jr., Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, CLINTON and McCORMICK, JJ.

OPINION

ROBERTS, Judge.

These appeals are from convictions for aggravated robbery. These appellants were tried together and each was assessed as punishment confinement for seven years.

The appellants do not challenge the sufficiency of the evidence. In their sole ground of error they contend that certain evidence admitted at their trial was the product of an illegal search and seizure. We agree.

The appellants were among four persons accused of committing an aggravated robbery of the complainant, Robert Herdman, on March 25, 1978, in Dallas. Herdman was reported missing during the early morning hours of March 25 by his fiancee, Carol Hutyra. Hutyra reported seeing Herdman leave his apartment with co-defendant William Paddock. As they left, Hutyra noted that the car had California license plates; she wrote down the license number. About 5:00 a.m. the car returned to the apartment complex without Herdman. Appellant Fry and co-defendant Paddock got out of the car. They then attempted to burglarize Herdman's apartment. When Hutyra screamed they left. Hutyra reported the incident to a police officer who left a written report for his replacement watch.

Later that afternoon, Officer Swafford followed up the report. He picked up Hutyra at her apartment and took her back to Herdman's apartment to see if he had returned yet. They arrived there about 2:00

p. m. and discovered that Herdman had just arrived. Herdman had been very badly beaten.

Herdman then told Officer Swafford that at about 3:00 a. m. he had taken Paddock home. Upon arriving at the house, which was about three blocks from his apartment, Herdman was ordered into the house by appellant Martinez who was holding a shotgun. During the next ten or eleven hours Herdman was robbed and repeatedly beaten by four men inside the house. At about 2:00 p. m., the men finally agreed to release Herdman, and appellant Martinez drove him back to his apartment.

About 3:00 p. m., Officer Arnold arrived at the apartment. Herdman again related the day's events to Arnold. He told Arnold that the men had discussed leaving for California that day. He also told him that at the time he was released three of the four men were asleep or had passed out.

Arnold left Herdman's apartment about 3:30 p. m. and drove to a nearby police substation. He called the Crimes Against Persons Section downtown and requested additional manpower to assist him in arresting the four men described by Herdman. He told the sergeant on duty that he "knew where the suspects probably were" and that he "didn't have time to secure a warrant."

After making the call, Arnold drove to a position near the house. He kept it under surveillance until the back-up officers arrived about thirty minutes later. During that time Arnold saw nothing occur at the house.

About 4:15 p. m., Arnold and the other officers surrounded the house. Arnold knocked on the door and identified himself as a police officer. When one of the other officers saw movement inside the house, Arnold kicked open the door. All four men were then arrested, and numerous weapons and other items were seized. Only appellant Martinez was awake when the police officers entered the house.

Before their joint trial, the four co-defendants filed a motion to suppress all items seized as a result of their arrest and the search of their residence. After an extensive hearing, the trial court overruled the motion. At trial the following items were admitted into evidence: a sawed-off shotgun, a shotgun, a rifle, a baseball bat, a wooden club, a chain belt, a bayonet, a butcher knife, an aerosol spray can, three spent tubes of toothpaste, a knife, a shotgun shell, and hair specimens. In addition, thirteen photographs of various parts of the house, which were taken at the time of arrest, were admitted into evidence. Three photographs of the house which were taken three months after the arrest were also admitted into evidence.

The testimony at the suppression hearing established that no police officers ever attempted to contact a magistrate in order to obtain an arrest warrant. Officer Arnold testified that because it was Saturday he did not think such an attempt would be successful.

If there was previously any doubt, it is now clear that under the Fourth Amendment to the United States Constitution, a warrantless arrest of a person in his own home is per se unreasonable absent exigent circumstances. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). As the Court stated in *Payton:*

"The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their ... houses ... shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.' *Silverman v. United States,* 365 U.S. 505, 511 [81 S.Ct. 679, 683, 5 L.Ed.2d 734]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent

exigent circumstances, that threshold may not reasonably be crossed without a warrant."

445 U.S. at 589–590, 100 S.Ct. at 1381–1382.

However, we need not decide whether the warrantless arrest made in this case violated the Fourth Amendment to the United States Constitution.

In Texas, a peace officer's authority to make a warrantless arrest is controlled exclusively by statute. *Lewis v. State,* 598 S.W.2d 280 (Tex.Cr.App.1980); *Honeycutt v. State,* 499 S.W.2d 662 (Tex.Cr.App.1973). The Code of Criminal Procedure authorizes very few exceptions to the general requirement that a peace officer obtain a warrant before making an arrest.[1]

At the pre-trial hearing held in this case, the State relied solely upon V.A.C.C.P., Art. 14.04, as authority for the warrantless arrest of the appellants. Art. 14.04 provides:

"Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."

There is no question in this case concerning the credibility of the information given to the arresting officers by the complaining witness. Neither is there a question concerning whether the arresting officers had probable cause to believe that a felony had been committed. The sole question in this case is whether the State met its burden of proving that the arresting officers reasonably believed that the appellants were about to escape, so that there was no time to procure an arrest warrant.

In *Honeycutt v. State,* 499 S.W.2d 662 (Tex.Cr.App.1973), we stated:

"In accordance with the strict construction given exceptions allowing warrantless arrests, this court has always required a clear showing that the person arrested was about to escape. As is often said when considering an arrest without

warrant, inarticulate hunches and suspicions are not enough to justify the arrest."

499 S.W.2d at 665. See also, *Hardison v. State,* 597 S.W.2d 355, 357 (Tex.Cr.App. 1980) ("A showing that the offender is about to escape is indispensable under Article 14.04 . . . .")

The State argues that the arresting officers reasonably believed that the appellants were about to escape, so that there was no time to procure an arrest warrant. It points out that the arrest took place on a Saturday afternoon, that the suspects had said that they intended to leave for California that day, and that the complainant, who had been released, knew where the suspects lived. The combination of these facts, the State contends, justified the arrest of the appellants without a warrant. We do not agree.

First, the testimony in the case is clear that Officer Arnold merely assumed that a magistrate would not be available to issue an arrest warrant for the appellants. Neither he nor anyone else even attempted to test that assumption by trying to locate a magistrate. In light of the other testimony in the case, Arnold's assumption carries little weight.

Shortly after 2:00 p.m. Officer Swafford had received enough information from the complainant to begin the process of obtaining a warrant. He did not attempt to do so.

Officer Arnold arrived at the complainant's apartment about 3:00 p.m. At about 3:30 p.m. he left the apartment and drove to a nearby police substation where he called for back-up officers. He, too, did not make any attempt to contact a magistrate himself or request that anyone else make such an attempt.

Arnold testified that he was aware that Dallas County had numerous judges who had the power to issue warrants. He also testified that on other occasions he had been able to obtain a warrant on a weekend or at night, and that to do so he had called

---

1. See V.A.C.C.P., Arts. 14.01, 14.02, 14.04, 18.-16.

a magistrate at home, if necessary, and then had gone to the magistrate's home to physically obtain the warrant. When he was asked why he did not attempt to obtain a warrant in this case, he replied:

"Because I have secured many warrants, and it takes a great deal of time in even locating a Judge on Saturday afternoon. It can take hours to get one.

"I did not have hours to sit out there and wait for those people to leave. I felt they were dangerous people and that the community would best be served if I arrested them at that time, rather than try to seek a warrant.

"Knowing the situation and how hard it is to get a Judge on Saturday afternoon, that was the best thing to do, considering the totality of the circumstances."

Arnold was later asked about the times when he had gotten a warrant:

"Q All right. Before the times you have gotten a warrant, how long did it take on an average?

"A I couldn't really give you an average figure. Sometimes, you can't find anybody, so you can't even place a time period on it.

"Q And sometimes you can just find them and get a warrant—like that?

"A That's right.

"Q So, it could run from thirty minutes to an hour, to not finding anybody?

"A That's right."

Since Arnold testified that on other occasions he had been able to obtain a warrant on a weekend, and since he conceded that the time involved in doing so could have been as little as half an hour, depending on the availability of a magistrate, we are unwilling to hold that the State has met its burden of showing that there was no time to procure a warrant. Absent proof that attempts were made to locate a magistrate and obtain a warrant, Arnold's bare assumption that such attempts would be unsuccessful carries little weight.

In addition, after their arrest, the appellants were transported to the city jail. They were then identified by Herdman, booked into the jail, and *taken before a magistrate* for arraignment. Thus the testimony establishes that a magistrate was on duty at least a few hours after the arrest.

Officer Arnold was questioned about the presence of a magistrate at the jail:

"Q When you took the defendants down to the station, you said you took them to arraignment?

"A No. I didn't take them directly to be arraigned, no.

"Q But after you photographed them and they were processed, you finally took them to arraignment?

"A Yes, sir.

"Q And who arraigned them?

"A Tom Boardman.

"Q And what is Tom Boardman?

"A *Tom Boardman is a weekend Judge down there,* the best I am able to determine, a practicing attorney.

"Q *Are you aware that he can issue warrants?*

"A *Yeah, I guess he can.*

"Q All right. Did you talk with Mr. Boardman before that—before you took them in for arraignment?

"A Yes, sir. I talked to him at the time I took them in.

"Q Was Mr. Boardman about to leave duty that day?

"A Yes, sir. He was fixing to come down to the County, as I recall.

"Q So, he had been there for some time, or at least before that time?

"A I don't know how long he had been there. I know he said something about going down to the County. I don't know when he came down.

"Q Have you ever secured a warrant from Mr. Boardman?

"A No, sir.

"Q Do you usually take people you arrest on Saturdays to be arraigned there at the City, after you finish with them?

"A No, sir. I usually don't.

"Q  But do you have knowledge that they are usually taken to be arraigned?

"A  They are usually arraigned, yes.

"Q  And that's by a Magistrate or a City Judge down there?

"A  Yes, sir.

"Q  Do you remember approximately what time it was that you took them in to be arraigned?

"A  Oh, eight or nine o'clock.  I would have to guess.  I don't know.

\*   \*   \*   \*   \*   \*

"Q  Now, I believe you said a while ago that Judge Boardman was on duty at City Hall sometime when you got back down there, is that right?

"A  He was up at the jail when I went up with the prisoners.

"Q  Now, is there not always—at least on weekends, mostly in the daylight and evening hours—a Judge on duty in City Hall?

"A  I don't know, to tell you the truth. I would assume that they are down there for arraigning prisoners, but I really don't know.

I normally don't personally take prisoners to be arraigned.

"Q  Well, isn't it a fact, officer, that there is a Municipal Judge, at least one, on duty, or Peace Judges, or part-time Judges like Mr. Boardman on duty all weekend long at the City Hall?

"A  That may be true.  I don't know.

"Q  Are you aware of Judge Cleo Steele here in the County Courthouse?

"A  Yes, sir.

"Q  And he's a Peace Judge?"

"A  Yes, sir."  (Emphasis added)

This testimony, too, undercuts the validity of Officer Arnold's assumption that a magistrate would have been difficult to locate.  Absent a showing that attempts to locate a magistrate were unsuccessful, Arnold's assumption in this case simply cannot sustain the State's burden of proof.  *See Hogan v. State,* 631 S.W.2d 159 (Tex.Cr. App.1982).

Second, the testimony in the case regarding the reasonableness of the arresting officers' belief that the appellants were about to escape is ambiguous at best.  Since the State has the burden of proving that a warrantless arrest falls within one of the statutory exceptions, ambiguity must be resolved against the State.

The complaining witness testified as follows:

"Q  ...  As best you can recall, what were the words you told [the police officers] about what [the appellants] were going to do after they had let you off?

"A  I just said every one of them was going to move out of the house and leave, and some of them were talking about going back to California.

"Q  Did they give you any time frame of when they were going to do that?

"A  That day.

"Q  That same day?

"A  Yes, sir.

"Q  Each of them told you that?

"A  Yes, sir.  They all said they was moving out that day.

"Q  Were any of them packing while you were in there?

"A  No, sir.  Three of them were passed out on the floor, or asleep on the floor, or whatever, and Martinez was still awake.

"Q  Did you tell the officers that three of them were passed out on the floor and one of them brought you back?

"A  I believe so, yes, sir.  I don't know."

According to this testimony, the appellants said that they intended to leave for California that day.  There was no testimony in the record which indicated that they ever said that they planned to do so immediately after releasing the complaining witness.  Furthermore, the complaining witness knew that three of the four assailants were incapable of immediate departure since they were passed out or asleep when

appellant Martinez took the complaining witness back to his apartment. The record does not clearly show whether the complaining witness communicated this knowledge to the police officers, but again, since the State has the burden of proving that the officers reasonably believed that the appellants were about to escape, any ambiguities must be resolved against the State.

In addition, Officer Arnold's own testimony casts doubt upon the reasonableness of such a belief:

"Q    You didn't think [the appellants] would leave without getting in the car?

"A    Without getting in the car or getting on a motorcycle. I didn't think they would walk on foot, as long as they had transportation available, so I didn't think they would be walking out the back door or something.

*      *      *      *      *      *

"Q    Now, you had been told that—by Herdman—that the four individuals in that house had told him they were going back to California as soon as they could move out of the house?

"A    They were talking about it among themselves.

"Q    Now, during the twenty-five to thirty minutes that you observed the house, you knew the car was there?

"A    Yes, sir.

"Q    You had seen it as you were going to the Northwest Substation?

"A    Uh-huh.

"Q    It was still there in the same position when you came back by?

"A    Yes, sir.

"Q    You assumed they were in the house?

"A    I assumed they were in the house.

*      *      *      *      *      *

"Q    . . . From your viewpoint, at your observation point, was there any attempt to move out of the house or escape by the people inside of it?

"A    No, sir.

*      *      *      *      *      *

"Q    . . . Was there ever a point of time when that house was not under surveillance, guard, or security?

"A    Yes, sir, there was.

"Q    That was while you were at the sub-station making a phone call?

"A    Yes, sir.

"Q    That was the twenty-five or thirty minutes—

"A    No, sir. It was more like five or six minutes, or seven minutes.

"Q    So, at least five or six minutes from the time you learned the address or location of the house, where was never more than five or six minutes of time when the house wasn't under police control or guard; is that right?

"A    Yes, sir.

"Q    And would that have been by you and some other officers, or some other officers when you weren't there, or what?

"A    From the time I learned the location of the automobile and the address, there was only a five or six minute span—seven minutes—whatever—that it was not under observation."

According to this testimony, Officer Arnold had the appellants' house under continuous observation from the time he left the complaining witness's house, which other testimony showed was about 3:30 p. m., until he and the back-up officers made the arrests about 4:15 p. m., with the exception of the five to seven minute period while he made the telephone call. Furthermore, the appellants' expected means of departure, their car, was also under observation. At no time did Arnold see any attempt to escape, or even any preparations for escape. He simply waited at his observation post until the back-up officers arrived and then made the arrest. This is simply not a case where quick action by the police, so that there was no time to procure a warrant, was necessary to prevent the appellants' imminent escape.

The dissent characterizes our opinion as requiring the State to show that the appellants were in the midst of their escape. It should not be so read. We only hold that the State has not met its burden of proving that the arresting officer reasonably believed that the offenders' escape was imminent.

The dissent cites a number of cases which it believes require us to uphold this warrantless arrest. Our reading of those cases persuades us that they are distinguishable on the facts, or are not controlling authority because they simply do not appear to have addressed the issues presented by this appeal.

The dissent appears to cite *Rose v. State,* 470 S.W.2d 198 (Tex.Cr.App.1971), for the proposition that the State can meet its burden of showing that a magistrate was unavailable by showing that a police officer assumed that fact. We do not so read *Rose.* The opinion in that case states, "The officers testified that they did not have time to procure a warrant after talking to Jeffries [the complaining witness] shortly before the arrest." *Id.* at 199. Nowhere in the opinion is there an indication of what evidence the State presented; however, nowhere is there an indication that the defendant challenged the testimony of the officers. In this case, as indicated above, there was testimony which severely undercut the bare assumption of unavailability made by the arresting officer.

Furthermore, in *Rose* the complaining witness told the arresting officer that the defendant was about to leave or had possibly already left. When the witness and the police officer arrived at the address given by the complaining witness, they were told that the defendant had already left. Here, the arresting officer may have been told that three of the four assailants were incapable of immediate departure. The arresting officer also testified that he assumed that the appellants were still at their house, and that the house was under almost constant surveillance. We think *Rose* is distinguishable on the facts.

In *Thornton v. State,* 451 S.W.2d 898 (Tex.Cr.App.1970), as in *Rose,* there is no indication in the Court's opinion that the officers' assertion that they did not have time to obtain a search warrant was disputed. Furthermore, there is no indication that the arrest was challenged upon the basis that no one had told the officers that the defendants were about to escape. The same is true of *Flanagan v. State,* 465 S.W.2d 755 (Tex.Cr.App.1971). For these reasons we do not regard these cases as authority for this cause.

In *Maloy v. State,* 582 S.W.2d 125 (Tex. Cr.App.1979), the arrest took place at approximately 3:00 to 3:30 a. m. As the Court's opinion stated, "the testimony is undisputed that there was no magistrate available at that hour." *Id.* at 127. There is also no indication in the opinion that the complaining witness' statement that the defendant was about to "bug out" and leave the city soon was disputed.

In *Loving v. State,* 559 S.W.2d 363 (Tex. Cr.App.1977), the arrest took place a few hours after the crime. However, more importantly, the defendants were driving in a car at the time the arrest occurred. See also, *Myre v. State,* 545 S.W.2d 820 (Tex.Cr. App.1977); *Washington v. State,* 518 S.W.2d 240 (Tex.Cr.App.1975); *Green v. State,* 470 S.W.2d 901 (Tex.Cr.App.1971). In each of those cases the defendants were arrested shortly after the commission of the crime and while they were driving in their cars. They were, therefore, already mobile and able to escape. That is not the case here.

As we view it, V.A.C.C.P., Art. 14.04, contains four requirements: (1) the person who gives the information to the peace officer must be credible, (2) the offense must be a felony, (3) the offender must be about to escape, and (4) there must be no time to procure a warrant. In this case, there is no question that the first two requirements have been met. However, we hold that the State has failed to meet its burden of proof on the last two requirements.

The evidence shows that the appellants were in their own home, under surveillance for at least forty-five minutes, that their expected means of escape was also under surveillance, that no attempt to escape or even preparation for escape was shown, and that the arresting officers may have been told that three of the four assailants were passed out or asleep when the complaining witness was released. In addition, the evidence shows that one of the arresting officers had secured warrants in the past on weekends and at night, that although it sometimes took a long period of time to do so, at other times it took no more than half an hour, that he was aware that there were numerous judges in Dallas County who could issue a warrant, that he was not sure whether a judge was on duty all weekend at City Hall, and that no attempt was ever made to contact a magistrate. On this record, we simply cannot hold that the State has met its burden of proving that the offenders were about to escape, so that there was no time to procure a warrant.

The facts of this case fail to justify the appellants' arrest in their home without a warrant. For this reason, the items seized at the time of their arrest, and the photographs taken at or near that time, should not have been admitted into evidence. V.A. C.C.P., Art. 38.23.

We turn now to the admissibility of the three photographs taken of the house three months after the arrest. These photographs were apparently taken after the appellants had moved out of the house, and at a time when the house was available for lease. We hold that under these circumstances, any taint from the illegal arrest was sufficiently purged. State's Exhibits Nos. 45, 48 and 49 were properly admitted into evidence.

1. All emphasis is mine unless otherwise indicated.

2. Judge Hawkins wrote on State's motion for rehearing. An earlier protest by Judge Lattimore to grant the motion of appellant for rehearing and reversing the judgment of conviction and remanding the cause indicates that we are not addressing a new problem, *viz:*
"... What was the officer to do? Here was a man of whose guilt the officer plainly be-

Because the other items and photographs were improperly admitted into evidence, these causes are reversed and remanded.

CLINTON, Judge, concurring.

Relatively recently the Court approved the following statement in *Hardison v. State,* 597 S.W.2d 355, 357 (Tex.Cr.App. 1980):

"A showing that the offender is about to escape is *indispensable* under Article 14.04, supra. *Honeycutt v. State,* supra [499 S.W.2d 662]. See *Butler v. State,* 151 Tex.Cr.R. 244, 208 S.W.2d 89 (1948)."[1]

Finding in *Honeycutt* that accused was arrested while in her home, in bed, militated against a showing that she was about to escape, the Court deemed "[e]specially pertinent" *Rippy v. State,* 122 Tex.Cr.R. 101, 53 S.W.2d 619 (1931), *Honeycutt,* supra, at 664. Writing for the Court more than fifty years ago, Judge Hawkins coined the original phrase we restated in *Hardison v. State,* supra. He explained:

"... That part of the statute which says that 'the offender is about to escape' is *indispensable.* That such condition did not exist in the present case seems to be without dispute in fact. At the time the officer went to appellant's house, appellant was partially undressed and in bed."

*Rippy v. State,* supra, 53 S.W.2d at 627.[2]

As noted by the Court in *Honeycutt,* "Imminent escape has long been held essential to a warrantless arrest under Article 14.04, supra, and its precursor ... [citing cases]." One obvious reason is that exceptions allowing warrantless arrests are given "strict construction," *id.,* at 665. And, in that con-

lieved himself to have satisfactory proof. If he had gone without arresting in such case and the accused had gotten in a car and traversed the few miles over the highway to the border of our sister state of Oklahoma, the officer would likely have had serious difficulty in escaping just criticism, if not more serious consequences." *Id.,* 53 S.W.2d at 625.

nection, the closing clause of Article 14.04, indicative of a limitation imposed on the legislative authorization, has generally been overlooked: "... such peace officer may, without a warrant, *pursue and* arrest the accused." Though the Court has not literally applied the underscored language so as to require that the alleged accused actually be fleeing, for a long time now it has insisted the facts in each individual case present objectively a situation in which pursuit is liable to follow at once if arrest is not made.[3]

Since I agree from the evidence there is not a clear showing that the persons arrested were about to escape, with these additional comments I join the opinion of Judge Roberts and the judgment of the Court.

McCORMICK, Judge, dissenting.

A review of the evidence shows that the arresting officers acted prudently and in accordance with Article 14.04, V.A.C.C.P., in making the arrests in question. The record reflects that the victim was abducted at 3:00 a. m. and released by his captors at approximately 2:00 p. m. that afternoon. He then related his ordeal to the police. The interview with police was concluded between 3:15 and 3:30 p. m. The police thereafter had one officer immediately place the house under surveillance until backup officers could arrive. The arrests were carried out at 4:15 or 4:20 p. m.

The victim testified:

"Q. Did any of the persons seated in the courtroom ever make any statements to you about leaving the jurisdiction of this county?

"A. Yes, sir.

"Q. And who was that?

"A. All of them did.

"Q. Okay. And when was this?

"A. It was during the night that I was held at the house.

"Q. And what did they say?

"A. They all just said that they was leaving.

Some of them said they was going back to California. And Martinez—when he took me home that day, he said that he was going to leave just as soon as he got back.

"Q. Just as soon as he got back?

"A. Just as soon as he got back and packed his stuff up, he was leaving.

"Q. Okay. Did you tell the police officer that they were planning to leave for California?

"A. Yes, sir."

On cross-examination, he testified:

"Q. So, between the hours of 3:00 a. m. and 2:00 o'clock, when Martinez dropped you off, they—the four defendants had collectively, at one time or another during the morning, or during the day had told you they were going back to California?

"A. Yes, sir.

"* * *

"Q. ... As best you can recall, what were the words you told them (police) about what they were going to do after they had let you off?

"A. I just said every one of them was going to move out of the house and leave, and some of them were talking about going back to California.

"Q. Did they give you any time frame of when they were going to do that?

"A. That day.

"Q. That same day?

"A. Yes, sir.

"Q. Each of them told you that?

"A. Yes, sir. They all said they was moving out that day."

An examination of the officer's testimony reveals the following:

"Q. At that time, did you believe that you had time to procure an arrest warrant for the persons you believed had assaulted and robbed Robert Herdman?

3. Just recently in *King v. State,* 631 S.W.2d 486 (Tex.Cr.App.1982), this Court concluded that "manifestly, from the 'concrete factual situation' spread on the record, it must be apparent that the offender was, in fact, 'about to escape'." (P. 497.)

"A. No, sir.

"Q. Why was that?

"A. Because they had talked of, in front of the complainant, leaving for California immediately; and I presumed they were preparing to leave.

"Q. Did you also have information that the persons in that house were armed?

"A. Yes, sir."

As soon as backup officers arrived, the arrests were made. On cross-examination, the arresting officer testified:

"Q. So, would that be Sergeant B. F. Fowler that you talked to?

"A. Yes, sir.

"Q. Did you discuss with him the availability of a City Magistrate on that telephone conversation?

"A. I said to him, 'I don't think that we have got time to try to find a Judge and get a warrant, do you?' And he said, 'No, I don't.'

"Q. Was that the extent of your conversation?

"A. Just about.

"Q. Was there anything else, if you can possibly recall, about the availability of a Magistrate?

"A. We talked about briefly in just about those words that I gave you— that it was Saturday afternoon, that there's not going to be a Judge available, and we just had to do what we had to do.

And he said, 'That sounds fine. You're exactly right. I will send you the man I have got here. Just do what you have to do.'

" * * *

"... I told him that I didn't have time to get a warrant, that I had some dangerous people in the house, who needed to be arrested.

He concurred that there was not enough time to get a warrant, and said to go do what I had to do.

"Q. Okay. Now, what was there about—

From your viewpoint of observing that house, what was there about the situation, from your point of observation, that causes you to say that there was not enough time to secure a warrant?

"A. Because I have secured many warrants, and it takes a great deal of time in even locating a Judge on Saturday afternoon. It can take hours to get one.

I did not have hours to sit out there and wait for those people to leave. I felt they were dangerous people and that the community would best be served if I arrested them at that time, rather than try to seek a warrant. Knowing the situation and how hard it is to get a Judge on Saturday afternoon, that was the best thing to do, considering the totality of the circumstances."

Article 14.04, V.A.C.C.P., provides:

"Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is *about to escape,* so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused." (Emphasis added)

The majority says that the mere assumption by an experienced police officer that a magistrate would not be readily available carries little weight. However, in *Rose v. State,* 470 S.W.2d 198 (Tex.Cr.App.1971), as here, the officer's assumption of the nonavailability of a magistrate was sufficient. There has never been a requirement that an attempt be made to contact a magistrate before an Article 14.04, supra, arrest can be made. Further, even if a magistrate had been readily available, the time to be taken in driving to the magistrate, setting out the probable cause, having it reviewed, and proceeding to the arrest might well have resulted in the escape of the suspects. When an armed offender is preparing to escape, time is of the essence. The statute reflects this. Even if the delay had been only thirty or forty-five minutes, such delay may have been critical. The majority seems to ignore

this factor. The officer assumed a magistrate would not be readily available. But even if one had been available, the officer could not have afforded the delay in making the arrest when he had reason to believe the offenders would be leaving at any moment.

The majority says that the assumption that a magistrate was unavailable is shown to be incorrect because the appellants later received magistrate warnings. However, this was between 8:00 and 9:00 p. m., not at the time of arrest.

Next, the majority claims that the record reflects that the victim testified that he told the officers that when he was released three of the four abductors were asleep or passed out and, therefore, the officers should have known there was no exigency in making the arrest. However, the record shows the victim testified as follows:

"Q. Did you tell the officers that three of them were passed out on the floor and one of them brought you back?

"A. I believe so, yes, sir. I don't know." It seems that such answer is different than that reported by the majority as a reason for not finding any exigency.

The majority points out that when the officers made their raid, three of the defendants were asleep or passed out. However, it is settled that questions concerning the legality of an arrest must be examined as the situation appeared to the officer at the time and not as it appears by hindsight, *Talbert v. State,* 489 S.W.2d 309 (Tex.Cr. App.1973).

Finally, the majority points out that an officer had the house and car under surveillance and that no defendants were seen leaving the house prior to the arrest. It has never been held that a defendant must be in the process of escaping before Article 14.04, supra, is applicable. The statute itself reads "about to escape." If the State were required to show that the defendants were in the midst of their escape, the statute would have said "and that the offender is escaping." All the State must do is show that the officer had reason to believe that

the offender is *about to escape.* Certainly that was done in this instance when the officer was told that afternoon that all of the offenders had said they would leave that day and one had indicated his leaving was imminent. This Court in *Tarpley v. State,* 565 S.W.2d 525 (Tex.Cr.App.1978), in upholding a warrantless arrest on the basis of Article 14.04, stated, "Contrary to appellant's contention, the fact that he and Hudson were not in the act of escaping at the time of the arrest is immaterial." 565 S.W.2d at 530. In that case, as here, the officers were told facts that led them to believe that the defendants were *about to escape* though there was no showing that the defendants had commenced the escape. Such was held sufficient to authorize a warrantless arrest. If an officer were forced to wait until the escape by armed and dangerous persons was commenced, the lives of the offenders, police, and innocent bystanders could be endangered. The statute does not require such a result, and, before today, neither had this Court. See *Rose v. State,* supra; *Maloy v. State,* 582 S.W.2d 125 (Tex. Cr.App.1979).

*Rutherford v. State,* 104 Tex.Cr.R. 127, 283 S.W. 512 (1926), was a reversal in which this Court, in interpreting the predecessor to Article 14.04, said that the officer must obtain a warrant unless he knows or is advised that the offender is about to escape. That is the situation confronted here by the police. The officer had been advised by the victim that the offenders were about to escape.

*Maloy v. State,* supra, is a case extremely similar to the instant case. There the police, apparently late at night and after obtaining probable cause to arrest, had been told that the defendant was going to "bug out" soon. There was, as here, testimony that a magistrate was not readily available. There was no showing an attempt was made to locate a magistrate. This Court upheld the warrantless arrest of the defendant in his residence pursuant to Article 14.04 on the basis that the officers had information that he was about to escape. Again, there was no showing that the de-

fendant was escaping, only that the officers had information that the defendant was about to escape. If the majority is going to reverse the instant case, *Maloy* should be distinguished or overruled.

In *Loving v. State,* 559 S.W.2d 363 (Tex. Cr.App.1977), the officer, after obtaining probable cause to arrest the defendant, apparently failed to seek an arrest warrant. This was at approximately 9:00 p. m. or shortly thereafter. Instead, he put out a pick-up order and resumed patrol. He then saw the suspects driving about, evidently in the same area. There is no indication that the suspects attempted to flee. During the search incident to arrest, inculpatory evidence was found. This Court, citing Article 14.04, upheld the arrest because it occurred only a few hours after the crime. The opinion was silent concerning the availability of a magistrate or any attempt to obtain a warrant.

In *Rose v. State,* supra, police officers were stopped by the victim of a robbery. The victim told the officer who had committed the robbery and where it occurred. The victim also stated that the suspect had left the premises or would be leaving soon. The officers later arrested the defendant. The officers testified that they did not believe they had time to attempt to procure a warrant. There is no indication an attempt was made to secure a warrant. When arrested, the defendant was in his house and had not begun to escape. Citing Article 14.04, this Court upheld the warrantless arrest. This Court distinguished that case from another warrantless arrest case, *Vinson v. State,* 138 Tex.Cr.R. 557, 137 S.W.2d 1048 (1940), in which the arrest was invalid. The Court held that the fact that the officers had been told by the victim that the offender would soon be escaping justified the warrantless arrest. The Court said:

"In the present case the officers testified that Jefferies (victim) told them that Rose (defendant) was about to leave. The specific words 'about to escape' do not have to be used to show that such an arrest may be authorized without a warrant under Article 14.04, supra." 470 S.W.2d at 200.

The distinction present in *Rose* is likewise present here.

In *Thornton v. State,* 451 S.W.2d 898 (Tex.Cr.App.1970), the defendants were arrested in an apartment without a warrant. This Court justified such arrest under Article 14.04 because there was no time to secure a warrant even though in that case no one had told the officers that the defendants were leaving. There the officers simply feared that the defendants might leave the location where they had been spotted. The officer, who first located the apartment where the defendants were, waited for backup support before making the arrests. The defendants had not yet commenced any escape at the time of the arrest.

Virtually indistinguishable from the case at bar is *Flanagan v. State,* 465 S.W.2d 755 (Tex.Cr.App.1971). In that case the police received word that the defendants were in a certain apartment and were about to leave town. The officer testified that he did not believe he had time to obtain a warrant. No showing was made that he made any attempt to contact a magistrate. This Court upheld the warrantless arrest pursuant to Article 14.04.

This case presents a far stronger argument for a warrantless arrest than *O'Neal v. State,* 416 S.W.2d 433 (Tex.Cr.App.1967). There the defendant claimed his arrest was illegal because there was no evidence he was about to escape. This Court said:

"In his fourth ground of error, appellant insists that the court erred in admitting the pair of shorts (state's exhibit 9), in evidence because they were obtained as the result of a search following an illegal arrest.

"The facts presented by the state relative to the arrest show that about 7 o'clock on the evening following commission of the offense, Deputy Sheriff J. N. Dechman received information from a businessman whom he considered to be credible that one of the three men being sought for the rape was named Lynwood and that one was named Alexander. Between 8 and 9 p. m., the officer had

ascertained the name of Lynwood O'Neal and a description of his car. The officer also had information that appellant would be in a certain general area and felt that if he took the time to try to find a magistrate to obtain an arrest warrant appellant might leave the area. At 10 p. m., he found appellant talking to another officer who had no intention of arresting him. The car meeting the description given was parked nearby. He then arrested appellant. Officer Dechman testified that it would have taken at least forty-five minutes for him to have gone after an arrest warrant and he felt that, had he done so, appellant might escape.

"Under the record, the officer was authorized to arrest appellant without a warrant, under the provisions of Art. 215, Vernon's Ann.C.C.P. of 1925, now Art. 14.04 of the 1965 Code, upon receiving information that the felony offense had been committed and fearing that appellant would escape. See: *Price v. State,* Tex.Cr.App., 410 S.W.2d 778, and cases therein cited." 416 S.W.2d at 435.

The Court concluded that the arrest and subsequent search were legal.[1] There was, however, as here, no showing an attempt was made to locate a magistrate. See also, *Sutton v. State,* 495 S.W.2d 912 (Tex.Cr. App.1972); *Washington v. State,* 518 S.W.2d 240 (Tex.Cr.App.1975); *Price v. State,* 410 S.W.2d 778 (Tex.Cr.App.1967); *Jones v. State,* 565 S.W.2d 934 (Tex.Cr.App. 1978).

The majority cites only two cases in discussing the legality of the arrest under Article 14.04, supra. These are both cited for the proposition that the right to a warrantless arrest is controlled by statute. I have no quarrel with such proposition. However, the majority does not bother to cite one case in examining whether the

arrest in question was valid. The majority simply overrules, sub silentio, numerous cases previously decided by this Court.

Second, even if the search violated Article 14.04, any error in admitting the seized evidence was harmless beyond a reasonable doubt. The victim testified positively that the appellants were the ones who had beaten and tortured him over an eleven hour period. His fiancee testified that she recognized two of the appellants as the persons who had attempted to burglarize the victim's apartment after he had been abducted. The fiancee got the license number of the car driven by the appellants. The car was found parked outside the house where they were arrested. Pictures of the house were identified by the victim as the place he was held. The entire tenor of the defense approach in cross-examination was not to cast doubt upon the identification of the appellants, but rather was an attempt to imply that the appellants believed that the victim precipitated the incident by stealing money from one of the appellants.

In *Holcomb v. State,* 484 S.W.2d 938 (Tex.Cr.App.1972), cert. denied 410 U.S. 940, 93 S.Ct. 1404, 35 L.Ed.2d 606 (1973), this Court held that, where the victim testified positively as to the defendant's identity, any error in admitting certain evidence seized as a result of an illegal arrest was harmless.

For the above reasons, I dissent.

### OPINION ON STATE'S MOTION FOR REHEARING

ODOM, Judge.

These appeals are from convictions for aggravated robbery. Punishment was assessed at seven years in each case.

---

1. The concurring opinion notes that the Fifth Circuit granted O'Neal relief. However, the Fifth Circuit granted relief only because they found that the officer lacked sufficient probable cause to arrest O'Neal. That issue is entirely separate from the issue before us today and from the quoted excerpt from *O'Neal v. State,* supra. Surely my brother Clinton does not contend that there was a federal constitutional

requirement for a warrant in the *O'Neal* case. See *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Just as surely there can be no serious argument made here that the police lacked probable cause. The distinction between probable cause for arrest and belief that a person is about to flee, both of which are required for a warrantless arrest, should not be confused.

A single ground of error was raised in the brief filed on behalf of both appellants. In it appellants argued that evidence admitted at trial was the product of an unlawful arrest and incident search and seizure, relying on Art. 14.04, V.A.C.C.P., and the Texas and United States Constitutions. On original submission a divided panel held the requirements of Art. 14.04, supra, were not satisfied and reversed the convictions. On rehearing we conclude the panel misconstrued the requirements of Art. 14.04, and we find the evidence was not unlawfully obtained.

Art. 14.04, supra, provides:

"Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."

The panel majority construed this statute to contain four requirements:

"(1) the person who gives the information to the peace officer must be credible, (2) the offense must be a felony, (3) the offender must be about to escape, and (4) there must be no time to procure a warrant."

In applying this construction to the facts of the case, the panel majority looked for evidence that the offender in fact was about to escape and that there was in fact no time to procure a warrant. Finding insufficient evidence of these two requirements, the panel majority held the arrest was unlawful.

■ We hold Art. 14.04, supra, does not require a showing that the offender in fact was about to escape, nor does it require a showing that there in fact was no time to procure a warrant. The statute merely requires a showing that the officer was acting upon satisfactory proof from representations by a credible person that the felony offender "is about to escape, so that there is no time to procure a warrant."

*Honeycutt v. State,* 499 S.W.2d 662 (Tex. Cr.App.), relied on by the panel majority, is clearly distinguishable from the facts in this case. In *Honeycutt* the defendant "was home in bed with her shoes removed. The record reflects that [the arresting officer] knew she lived there for more than a year. There was no evidence of an escape or an attempt to escape." Likewise, in *Rippy v. State,* 122 Tex.Cr.R. 101, 53 S.W.2d 619, the defendant's arrest was not authorized under the predecessor of Art. 14.04, where the record showed the defendant was partially undressed and in bed when arrested, and there was no evidence he was about to escape.

In sharp contrast to the evidence in *Honeycutt* and *Rippy* are the facts presented in *Maloy v. State,* 582 S.W.2d 125 (Tex.Cr. App.), and in the instant case.

In *Maloy,* supra, a credible person reported to the arresting officers the defendant's "name and address and told them that he was about to 'bug out' or flee the city soon." This was held sufficient to authorize an arrest under Art. 14.04, supra.

■ Even stronger are the facts in this case, where it is undisputed that the robbery victim reported to investigating officers that one of the robbers told him "Just as soon as he got back and packed his stuff up, he was leaving," and that several of the robbers said they were leaving for California that day. This clearly was sufficient to constitute a report "that the offender is about to escape, so that there is no time to procure a warrant." It is also sufficient to show exigent circumstances authorizing a warrantless arrest under Texas and federal constitutional law.

The State's motion for rehearing is granted and the judgments are affirmed.

ONION, P. J., and ROBERTS, CLINTON and TEAGUE, JJ., dissent.