Larry Jerome DODSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 65482.

Court of Criminal Appeals of Texas, Panel No. 3.

Nov. 12, 1980.

On Rehearing March 1, 1983.

James Gregory Glass, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Ray Elvin Speece and Tony Balderas, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This is an appeal from an order revoking probation. Appellant was originally convicted for burglary of a habitation and placed on probation for six years. One condition of his probation was that he commit no offense against the law. Subsequently a motion to revoke probation was filed, alleging appellant violated the conditions of his probation by committing the offenses of burglary of a building and theft. Following a hearing the court found appellant had committed burglary of a building and revoked the probation. This appeal followed.

Appellant first contends the trial court erroneously overruled his motion to suppress evidence obtained when he was stopped on the night of the offense. It is argued that the police officers stopped his automobile at the time in question on a pretext, and without lawful cause. A review of the facts surrounding that event is necessary.

Houston police officers Manes and Flakes were on patrol in the early morning hours of July 16, 1979, when the stop occurred. Manes was the only witness to testify at the hearing on the motion to suppress. At about 2:30 a.m. they saw a car hauling a large piece of furniture in the trunk. Manes noticed that the car had a paper dealer's license tag that "was so faded and weather-beaten it was unreadable." The officers followed the car until it reached a safe stretch of road that was straight and well lighted, and stopped it. Appellant was driving. With him was a 12 year old passenger, and in the trunk was an organ that subsequently was shown to have been taken in the burglary of a nearby church. When asked to produce a driver's license, appellant was not able to do so. Flakes started to issue a citation for no driver's license and no vehicle registration.

From talking to appellant and the passenger, the officers received conflicting information about appellant's name and about where the organ in the trunk came from. Eventually the passenger told the officers that the organ came from a nearby building. Appellant was taken into custody and told he was going to jail for the traffic tickets. Manes also testified that he arrested appellant for giving a false name.

After his arrest, appellant was taken to the building from which the passenger had said the organ was taken. It was discovered that a church had been burglarized. The pastor was called and identified the organ as belonging to the church.

The issue raised in this appeal concerns only the first moments of the above described sequence of events. The argument advanced is that the initial stop of appellant's automobile was on mere pretext for the purpose of investigating the organ, not for any traffic violation. The following testimony, on cross-examination of officer Manes, is the foundation for appellant's argument:

"Q. When did you first notice something sticking out of the trunk?

"A. As the vehicle turned south on Homestead.

"Q. Could you tell what it was right off?

"A. It was furniture of some kind was my first impression, a large article of furniture.

"Q. Did you and your partner ever discuss the possibility or probability that whatever was in the trunk might be stolen before you pulled the car over?

"A. I don't exactly remember. We discussed that it was an odd time of morning for moving, and the way this article was tied into the trunk of the vehicle. I don't remember our exact conversation because it had been a few moments.

"Q. So you had a suspicion it might be stolen before you pulled him over?

"A. I thought something was wrong, yes sir.

"Q. Did you have any specific facts that would have led you to believe that that organ was stolen or whatever that piece of furniture was in the trunk, whether you knew it was an organ or not, did you have any facts on which to base your beliefs it might be stolen?

"A. At which time are you talking about?

"Q. Before you pulled the car over.

"A. I had no specific report of a stolen organ, no sir.

"Q. Did you have any other facts that led you to believe it might be a stolen organ?

"A. Prior to pulling him over?

"Q. Yes, sir.

"A. No, sir.

"Q. Let me ask you this. Were you or your partner looking for a way to legally stop the defendant to see if the organ might be stolen?

"A. I'm not quite sure how to answer that. All I know is the vehicle when it turned south, we noticed the license plates that were not valid and we stopped the vehicle.

"Q. Were you and your partner looking for a way to stop it so you could stop it and investigate whether it was stolen, in other words, a legal reason to stop it?

"A. Any time I stop a vehicle, personally I try to have a legal reason for stopping it for my own self legally, so if you would go on that basis, yes sir, any vehicle I stop I try to have a legal reason for probable cause.

"Q. Would you say your primary purpose for stopping it was to investigate the origin of that organ?

"A. Again I really don't know what words to choose. Will you repeat that question, please?

"Q. What I'm getting at is I want to know the primary purpose in your own mind of stopping the defendant. Was it to investigate where that organ came from?

"A. No. I wouldn't say that was the primary concern. The question to me is vague and broad. I was just conducting my duty as I saw it in my own way.

"Q. You said you were suspicious about this organ, is that correct?

"A. Yes sir, I said I was suspicious something was wrong.

"Q. And you wanted to investigate those suspicions, is that correct?

"A. Yes, if you want to put it that way.

"Q. So you wanted to find a legal reason to stop him?

"A. Yes sir. I stopped the vehicle using what I considered at the time a legal stop and arrest.

"Q. A legal way of—but the purpose you were using was a legal way to investigate about the organ, is that correct? I'm just asking you to be honest with us.

"A. Yes, I'm being honest. I stopped that vehicle that night conducting my duty.

"Q. To answer my question, you were using that pretext to stop the vehicle and find out where the organ came from?

"A. Yes sir."

The officer plainly admitted that he was using the traffic stop as a pretext to find out where the organ came from. Several opinions of this Court have discussed "pretext stops."

In *Fatemi v. State*, 558 S.W.2d 463, the stop was held unlawful where the *only* purpose for the stop was to check ownership of the car on a hunch of the officer. In *Faulkner v. State*, 549 S.W.2d 1, and *Talbert v. State*, 489 S.W.2d 309, there likewise was *no* traffic offense observed by the officer, and a hunch was the *only* reason for the stop. All of these cases were reversed. The facts in this case are distinguishable from those in that here, in addition to Manes' admission that he stopped appellant's car on a pretext to find out where the organ came from, he also testified that he stopped the car because the license tag was illegible.

In *Hooper v. State*, 533 S.W.2d 762, *Hampton v. State*, 511 S.W.2d 1, and *Hall v. State*, 488 S.W.2d 788, the State argued that an apparent pretext arrest was supportable as a lawful stop for a traffic violation. The same argument is made by the State in this case. *Hooper* and *Hall* were reversed, while *Hampton* was affirmed.

In *Hall* the defendant was stopped for the traffic offense of turning without giving a signal. At the time of the event a signal was required only in certain circumstances. It was held that no offense justifying the traffic stop was shown:

"Under the record there is no showing that appellant's action of turning without giving an appropriate signal was under such circumstances as to be a threat or hazard to traffic safety or affecting the movement of other traffic as prohibited by Article 6701d, Sec. 68(a), Vernon's Ann.R.C.S. in effect at the time of appellant's arrest so as to authorize his arrest without warrant under Sec. 153 of the Article. Under the decision of this Court in *Willett v. State*, Tex.Cr.App., 454 S.W.2d 398, giving application to this statute where a vehicle was driven into a private driveway, appellant's arrest was unlawful and the search of his vehicle unauthorized."

In *Hooper*, supra, one officer had received a tip that the defendant was attempting to sell obscene movies. Another officer, having heard a bulletin from the first officer to attempt to locate defendant's vehicle, spotted it and stopped it for defective brake lights. Evidence seized incident to that traffic stop and arrest was used to corroborate the tip and secure issuance of a search warrant. The stop was held unlawful:

"At the outset we are confronted with what appears to be a pretext arrest. A search incident to a pretext arrest is invalid. *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932); *Amador-Gonzalez v. United States*, supra [391 F.2d 308 (5th Cir. 1968)]; *Pruitt v. State*, 389 S.W.2d 475 (Tex.Cr.App.1965), overruled on other grounds in *Onofre v. State*, 474 S.W.2d 699 (Tex.Cr.App.1972); *Adair v. State*, 427 S.W.2d 67 (Tex.Cr.App.1967) (dissenting opinions of Onion, J., and Morrison, J., and cases cited therein); *Talbert v. State*, 489 S.W.2d 309 (Tex.Cr.App.1973); *Hall v. State*, 488 S.W.2d 788 (Tex.Cr. App.1973).

"The only evidence in the record that appellant's brake lights were defective were the hearsay statements of Detective Waggoner that appellant was stopped for that reason and booked on that charge. Waggoner's subsequent affidavit in support of the search warrant also made this allegation. However, the city attorney later dismissed charges on the traffic offense and a mechanic testified that the brake lights were not defective when he examined them the next day. The arresting officer, Detective Holt, did not testify, but he must have been aware of Waggoner's 'attempt to locate' radio bulletin prior to appellant's arrest.

"The State has the burden of proving the legality of a warrantless arrest or search. *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971); *Washington v. State,* 518 S.W.2d 240 (Tex.Cr.App.1975). As in *Farr v. State,* 519 S.W.2d 876 (Tex.Cr.App.1975), the State here failed to put on the one witness who could provide the testimony needed to discharge its burden. See also *Paprskar v. State,* 484 S.W.2d 731 (Tex.Cr.App.1972). Appellant has made out a prima facie case of pretext arrest, and the only evidence refuting it is the hearsay testimony of Waggoner, which has no probative value at all. *Lumpkin v. State,* 524 S.W.2d 302 (Tex.Cr.App.1975). The conclusion is inescapable that appellant was arrested for the sole purpose of obtaining evidence to corroborate Waggoner's anonymous informant. 'An arrest may not be used as a pretext to search for evidence.' *United States v. Lefkowitz,* supra 285 U.S. at 467 and, 52 S.Ct. at 424."

From *Hooper* and *Hall* we are instructed that in a case such as this the State has the burden of showing that the facts observed by the officer justified the traffic stop. *Hampton v. State,* supra, on the other hand, illustrates that it is *not* necessary that the traffic stop, if supported by a demonstrated traffic offense, be motivated *solely* by the observed violation. The opinion in *Hampton* reveals the trial record:

"In the suppression hearing held outside of the presence of the jury, Elliott made no mention of any traffic violation when he was interrogated by the State's attorney. Upon cross-examination, being asked by Johnson's counsel if he had stopped the car because of a traffic violation, Elliott said that he had done so because of the driver's '[f]ailure to maintain a single lane' in a multi-laned street. He did not file any charges for the traffic violation nor was it mentioned in his official report of the incident. As a matter of fact, Elliott said that he did not even mention the traffic violation at the time he arrested the appellant and his companions. At the conclusion of the hearing, the Court overruled the objections to the search.

" . . .

"We concede that Elliott's testimony would have been more persuasive had he mentioned the traffic violation at an earlier point in his testimony or had taken some steps to make it a matter of contemporaneous written record. But there was some evidence from Officer Elliott which supported the State's version that the vehicle was stopped because of a traffic violation, and appellant offered nothing to refute this testimony."

In the instant case the arresting officer admitted that he stopped appellant's car in order to find out where the organ in the car's trunk came from. If this were the only basis for the stop, it would clearly have been unlawful. *Fatemi, Faulkner* and *Talbert,* supra. In this case, however, the officer also testified that he stopped the car because it exhibited a paper dealer's license tag that "was so faded and weather-beaten it was unreadable." The State relies on this basis for the traffic stop to argue that the officer was acting on his observation of traffic violations under Articles 6686(a)(3), 6675a–3(f), 6675b–7, and 6701d, Sec. 111(c), V.A.C.S.

Articles 6686(a)(3) and 6675a–3(f), supra, provide for temporary operation of a new vehicle for twenty days with a buyer's cardboard tag. Although the officer here testi-

fied that the tag was faded and weather-beaten, we cannot say that such observation at 2:30 a.m. would support a reasonable belief that appellant was operating a vehicle with an expired cardboard tag.

The portion of Art. 6675b–7, supra, relied on by the State provides:

"All letters, numbers and other identification marks [of a license tag] shall be kept clear and distinct and free from grease or other blurring matter so that they may be plainly seen at all times *during daylight.*" (Emphasis added.)

Inasmuch as the traffic stop in this case occurred at 2:30 in the morning, it appears that no violation of this statute was observed.

Finally, the State places reliance on this part of Art. 6701d, Sec. 111(c), supra:

"Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty (50) feet to the rear."

Although the officer here testified that the tag was illegible, he did not testify that he was as close as the required legibility distance of fifty feet, nor did he testify that its illegibility was due to inadequate illumination. We find the evidence does not show facts that would support a traffic stop under this provision.

As in *Hooper v. State,* supra, and *Hall v. State,* supra, we find the State has failed to discharge its burden. The testimony of the officer falls short of proving that a traffic violation was observed. The traffic stop, on the record before us, appears to have been a pretext to find out where the organ came from. It was therefore error to deny the motion to quash the evidence that was discovered in the wake of the unlawful stop. Without that evidence there is nothing to support the order revoking probation.

The judgment is reversed and the cause remanded.

Before the court en banc.

STATE'S MOTION FOR REHEARING

W.C. DAVIS, Judge.

On original submission, a panel of this Court reversed an order revoking appellant's probation on the basis that the trial court erred in overruling appellant's motion to suppress evidence. The panel held that the stop of appellant's automobile, which ultimately led to his arrest for the offenses of burglary of a building and theft, constituted an unlawful "pretext stop." Upon reconsideration we now affirm.

Briefly stated, the pertinent facts are as follows: at approximately 2:30 a.m., July 16, 1979, Houston police officers Manes and Flakes observed a car with a "large article of furniture" in the trunk. Officer Manes also noticed that the car had a paper dealer's license tag that "was so faded and weather-beaten it was unreadable." The officers followed the car until it reached a safe stretch of road and stopped it. When asked to produce a driver's license, appellant was unable to do so. Flakes started to issue a citation for no driver's license and no vehicle registration. After receiving conflicting information, the officers took appellant into custody for the traffic tickets and for giving a false name.

The article of furniture in appellant's trunk was then found to be an organ, later identified as having been stolen from a nearby church.

In his first ground of error, appellant argued that the officers had no probable cause to arrest, search or investigate either himself or his vehicle, and that officer Manes "resorted to an illegal pretext arrest in order to investigate his suspicions regarding the 'large article of furniture' sticking out of the trunk of [a]ppellant's vehicle." As the basis for this contention appellant directs the Court to the following testimony of Manes upon cross-examination:

"[BY DEFENSE COUNSEL]:

"Q. When did you first notice something sticking out of the trunk?

"A. As the vehicle turned south on Homestead.

"Q. Could you tell what it was right off?

"A. It was furniture of some kind was my first impression, a large article of furniture.

"Q. Did you and your partner ever discuss the possibility or probability that whatever was in the trunk might be stolen before you pulled the car over?

"A. I don't exactly remember. We discussed that it was an odd time of morning for moving, and the way this article was tied into the trunk of the vehicle. I don't remember our exact conversation because it had been a few moments.

"Q. So you had a suspicion it might be stolen before you pulled him over?

"A. I thought something was wrong, yes sir.

"Q. Did you have any specific facts that would have led you to believe that that organ was stolen or whatever that piece of furniture was in the trunk, whether you knew it was an organ or not, did you have any facts on which to base your beliefs it might be stolen?

"A. At which time are you talking about?

"Q. Before you pulled the car over.

"A. I had no specific report of a stolen organ, no sir.

"Q. Did you have any other facts that led you to believe it might be a stolen organ?

"A. Prior to pulling him over?

"Q. Yes, sir.

"A. No, sir.

"Q. Let me ask you this. Were you or your partner looking for a way to legally stop the defendant to see if the organ might be stolen?

"A. I'm not quite sure how to answer that. All I know is the vehicle when it turned south, we noticed the license plates that were not valid and we stopped the vehicle.

"Q. Were you and your partner looking for a way to stop it so you could stop it and investigate whether it was stolen, in other words, a legal reason to stop it?

"A. Any time I stop a vehicle, personally I try to have a legal reason for stopping it for my own self legally, so if you would go on that basis, yes sir, any vehicle I stop I try to have a legal reason for probable cause.

"Q. Would you say your primary purpose for stopping it was to investigate the origin of that organ?

"A. Again I really don't know what words to choose. Will you repeat that question, please?

"Q. What I'm getting at is I want to know the primary purpose in your own mind of stopping the defendant. Was it to investigate where that organ came from?

"A. No. I wouldn't say that was the primary concern. The question to me is vague and broad. I was just conducting my duty as I saw it in my own way.

"Q. You said you were suspicious about this organ, is that correct?

"A. Yes sir, I said I was suspicious something was wrong.

"Q. And you wanted to investigate those suspicions, is that correct?

"A. Yes, if you want to put it that way.

"Q. So you wanted to find a legal reason to stop him?

"A. Yes sir. I stopped the vehicle using what I considered at the time a legal stop and arrest.

"Q. A legal way of—but the purpose you were using was a legal way to investigate about the organ, is that correct? I'm just asking you to be honest with us.

"A. Yes, I'm being honest. I stopped that vehicle that night conducting my duty.

"Q. To answer my question, you were using that pretext to stop the vehicle and find out where the organ came from?

"A. Yes sir."

Appellant, and the panel on original submission, find that this testimony conclusively shows that the search in question was unlawful as incident to a pretext arrest.

In *Hampton v. State,* 511 S.W.2d 1 (Tex. Cr.App.1974), this Court dealt with a search pursuant to a " 'suspicious' activity" call and a subsequent traffic violation of " '[f]ailure to maintain a single lane' in the multi-laned street." Although no charges were filed against the appellant for this violation, and no mention of this violation was even made until the suppression hearing, this Court upheld the overruling of the motion to suppress, stating:

"We concede that Elliott's testimony would have been more persuasive had he mentioned the traffic violation at an earlier point in his testimony or had taken some steps to make it a matter of contemporaneous written record. But there was some evidence from Officer Elliott which supported the State's version that the vehicle was stopped because of a traffic violation, and appellant offered nothing to refute this testimony.

. . . .

"The initial factual determination of the question presented—Did Elliott stop the car because of a traffic violation? or, Did he do so upon his earlier unsupported suspicion?—was for the trial court. He was present and observed the witness' demeanor and the manner in which he testified. We are unwilling to conclude, upon this record, that the trial court abused its discretion in impliedly finding that Elliott told the truth." 511 S.W.2d at 4.

 The holding in *Hampton* stands for the proposition that a traffic stop based at least in part on the valid observation of a traffic offense will not be found unconstitutional simply because the officer had additional suspicions, which by themselves would not justify the stop. Also see *Armitage v. State,* 637 S.W.2d 936 (Tex.Cr.App. 1982); *Dillard v. State,* 550 S.W.2d 45 (Tex. Cr.App.1977). Compare *Faulkner v. State,* 549 S.W.2d 1 (Tex.Cr.App.1977); *McDougald v. State,* 547 S.W.2d 40 (Tex.Cr.App. 1977); *Leighton v. State,* 544 S.W.2d 394 (Tex.Cr.App.1976).[1]

 In the case at bar, while Officer Manes testified that he and his partner were suspicious of the organ in appellant's trunk, he further testified that he stopped the vehicle on the basis of a valid traffic offense.[2]

---

1. The panel's original opinion relies on *Hooper v. State,* 533 S.W.2d 762 (Tex.Cr.App.1975) and *Hall v. State,* 488 S.W.2d 788 (Tex.Cr.App. 1973) in support of its holding. These decisions are distinguishable from the case at bar. In both *Hooper* and *Hall,* the judgments were reversed on the basis of a pretext arrest due to the State's failure to prove that a traffic offense actually took place. In Hooper, it was shown that the city attorney dismissed the charges on the traffic offense of defective brake lights, and a mechanic testified that the brake lights were not defective when he examined them the next day. In *Hall,* there was no showing that the appellant's failure to use his turn signal even constituted a traffic violation. In contrast, the officer in the instant case stopped appellant's vehicle, at least in part, on the basis of an actual traffic violation. Manes testified that he observed that appellant's vehicle had an outdated dealer's license tag, he intended to write appellant a citation for that offense, and this violation was partially the reason appellant was subsequently placed in custody. The illegality of the license tag was never rebutted by appellant.

2. On original submission, the panel held that the stop was based on a "mere pretext" due to insufficient proof that there was a violation of Articles 6686(a)(3), 6675a–3(f), 6675b–7, and 6701d, Sec. 111(c), V.A.C.S. Specifically, Articles 6686(a)(3), and 6675a–3(f), provide for Buyer's Temporary Cardboard Tags, while Art. 6675b–7, requires all number plates to be kept clean "so that they may be plainly seen at all times during daylight," and Art. 6701d, Sec. 111(c), requires a tail lamp near the rear registration plate which renders "it clearly legible from a distance of fifty (50) feet to the rear." The panel opined that: (1) because the stop took place at 2:30 a.m., no violation of Art. 6675b–7 could have occurred, and (2) because there was no evidence as to the distance from which the officers observed the vehicle, no violation of Art. 6701d, Sec. 111(c) had been shown. While in a proper case the violation of either or both of these statutes would give an officer the right to stop a vehicle, in the present case these statutes are wholly irrelevant; no issue was ever raised, nor was any evidence adduced as to the applicability of either statutory provision. The officers' observation of a license tag that "was so faded and weather-beaten it was unreadable, you couldn't read what it was about," was sufficient *in and of itself* to constitute probable cause to believe that the tag was outdated and therefore invalid.

As in Hampton, supra, there was ample testimony to show that the vehicle was stopped because of a traffic violation, and appellant offered nothing to refute this testimony. The initial factual determination was for the trial court. We find that the record before us supports the trial court's finding that the officers stopped appellant's vehicle in a lawful manner and not upon a "mere pretext".

In his second ground of error, appellant alleges that the trial court erred in revoking his probation based on insufficient proof that he committed the burglary. He maintains that the "unexplained recent possession" rule was inapplicable in that: (1) Kelvin Mitchell, the passenger in appellant's vehicle, did explain appellant's possession of the organ, (2) no positive identification of the organ was ever made, and (3) there was no evidence to show that the church was not open to the public at the time the organ was stolen. We cannot agree.

The "unexplained recent possession" rule is stated as follows:

> "A burglarious entry . . . having been established, the unexplained possession by the accused of property recently stolen from the premises is generally considered to be sufficient to support a conviction of burglary." *Nelson v. State,* 599 S.W.2d 809 (Tex.Cr.App.1980); *Jones v. State,* 458 S.W.2d 89 (Tex.Cr.App.1970).

 The evidence in the present case showed that religious services were held in the church the evening prior to appellant's arrest. The reverend had left the church at approximately 10:00 p.m., at which time the building had been locked with the organ inside. After appellant was taken into custody an investigation of the church revealed a broken window, forcible entry at the church's back door, and no organ inside. We find this evidence independently establishes proof of a burglary, and when combined with appellant's unexplained possession of the organ we find the proof to be sufficient to support the trial court's finding that appellant committed the offense of burglary.

Finally, appellant alleges that the court erred in revoking his probation because the State failed to prove all the elements of the offense of theft.

 While the Motion to Revoke Probation alleged both the offense of burglary and the offense of theft, the Order Revoking Probation and Sentence recited only the offense of burglary. Despite the fact that the court declined to use it as a basis for the revocation, appellant now invites us to review the sufficiency of the proof of theft. We decline the invitation.[3]

The State's Motion for Rehearing is granted and the judgment is now affirmed.

ODOM, CLINTON, TEAGUE and MILLER, JJ., dissent.

---

**3.** We further note that even *had* the court recited the theft offense in the order revoking appellant's probation, a finding of sufficiency as to the burglary allegation would make any review of the theft allegation fruitless. *Ross v. State,* 523 S.W.2d 402 (Tex.Cr.App.1975).