Thomas J. BAIN, Appellant,

v.

The STATE of Texas, Appellee.

No. 1118–83.

Court of Criminal Appeals of Texas, En Banc.

Sept. 19, 1984.

Jim Duvall, Dumas, for appellant.

Barry E. Blackwell, Dist. Atty., Dumas, Robert Huttash, State's Atty., Austin, for the State.

▮

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

TOM G. DAVIS, Judge.

Trial was before the jury upon appellant's plea of not guilty of murder. After finding appellant guilty, the jury assessed punishment at life. The conviction was reversed by the Court of Appeals for the Seventh Supreme Judicial District (Amarillo) in an unpublished opinion. We granted the State's petition for discretionary review

in order to examine the Court of Appeals' holding that appellant's confession was the fruit of an illegal arrest.[1]

Appellant was convicted of intentionally or knowingly causing the death of James Langford by stabbing him with a knife.

The probable cause question presented in this petition requires a detailed review of the facts surrounding Langford's murder.

Ken Carley was a patrolman with the Dalhart Police Department in April of 1981. On Sunday the 26th at approximately 10:30 a.m., Carley drove to the Winetree section of Dalhart after receiving a tip from a private citizen. The Winetree is an area frequented by transients. Upon arrival at the Winetree, Carley discovered the deceased's body. There were numerous stab wounds to the deceased's chest and contusions and abrasions about his face. His hands were bound with a shoelace to a piece of machinery.

This discovery set off an intense investigation of Langford's murder by law enforcement personnel in Dalhart. Officer Eddie Bias headed the investigation.

Shortly after Bias arrived at the crime scene on the 26th, he left in order to pick up Judge E.G. Carter, a justice of the peace. Judge Carter was at the crime scene for part of the morning and afternoon of the 26th. Bias surmised that Langford had been dead since the preceding afternoon or evening.

Bias went to the local rescue mission to investigate further. He spoke to Paul West the director of the mission and to several transients including Clarence Voris, Rex Boyce, Lee Leno, and Walter Waldrop. Apparently Bias knew some of these individuals prior to the investigation, but had never before met Leno and Waldrop.

---

1. The Court of Appeals, after finding that the confession was illegally admitted, concluded that the remaining evidence was insufficient to support the conviction. All the evidence proper and improper must be considered in determining sufficiency. *Porier v. State,* 662 S.W.2d 602 (Tex.Cr.App.1984).

Bias received the following information on Sunday the 26th from West, Voris, Boyce, Leno, and Waldrop:[2]

(1) Appellant, who at the time of the murder investigation went under the name of William R. Hall, and his friend, George Erwin, were seen at the murder site with the deceased on the previous afternoon;

(2) Appellant, Erwin and the deceased were drinking Mogen David wine and Old Milwaukee beer;

(3) Appellant had been wearing brown corduroy pants and a pair of brown corduroy pants was missing from the rescue mission;

(4) Erwin was wearing a blue jacket;

(5) Appellant and Erwin were carrying a large plastic bag;

(6) Appellant and Erwin were at the rescue mission late Saturday night or early Sunday morning. Appellant's knuckle was skinned. Somebody asked how it happened and appellant replied that another man tried to take his and Erwin's wine and appellant "busted him." Appellant turned to Erwin and said, "But he won't do that again will he?"

Bias already knew from the police investigation at the murder scene that the following items were found near the deceased's body:

(1) a blue jacket;

(2) a bloody pair of brown corduroy pants;

(3) a large plastic bag;

(4) Old Milwaukee beer cans and various wine bottles.[3]

At trial, Bias was unsure of the precise time on Sunday the 26th by which he had gathered the above information. Bias estimated, however, that he felt he had probable cause to arrest appellant and Erwin at around 3:00 or 4:00 p.m.

The dispatcher sent out a bulletin on the police radio to Texas, Oklahoma, and New Mexico calling for the apprehension of appellant and Erwin and giving descriptions of each man. Later, teletypes to the same effect were sent to Texas, Oklahoma, New Mexico, Colorado, and Kansas.

Bias did not obtain an arrest warrant before sending out the radio dispatches and teletypes calling for the apprehension of appellant or before he commenced his own search for appellant.

Bias failed to obtain a warrant because the district attorney was not in town. He was under the erroneous impression that in order to obtain an arrest warrant he had to procure a written complaint *from the district attorney first.* Bias made no attempt whatsoever to obtain an arrest warrant from any local magistrates including Judge Carter who had been at the crime scene for part of the day.

Constable Frank Coulson of Texline was driving his automobile on official duty between 5:00 and 5:30 p.m. on Sunday the 26th when he received a call over the police radio from Dallam County Deputy Sheriff E.H. Little. Texline and Dalhart are both located in Dallam County.

Coulson testified that he knew and often took advice from law officers located in Dalhart since he considered them more experienced in police matters.

Little informed Coulson of the murder and gave him the names and descriptions of appellant and Erwin. Coulson began to search Texline for the suspects. Texline is on a railroad route that runs in part from Dalhart through Texline and on into New Mexico and Colorado.

Coulson initially checked the cafes in and around Texline for suspects fitting the de-

---

2. Bias had trouble remembering which of the citizen-informants gave him particular pieces of information. He evidently received different information from each of the informants, and no one informant gave him all of the information he obtained.

3. Bias also received information that the deceased and either appellant or Erwin were wearing hats on the previous day. A hat was found near the deceased's body, but Bias did not know who it belonged to. At any rate, nothing in the record discloses how the discovery of a hat at the murder scene was probative on the issue of probable cause.

scription given by Little. He also checked the incoming trains, "not going up on it, but just kept watching it—it was a coal train—as it went through town."

At approximately 10:30 p.m., Coulson went to bed. Coulson was later awakened by a telephone call from Martha Sandoval, a train dispatcher at the Texline train depot. While he was dressing in order to go down to the depot, Coulson was again phoned by Sandoval. The gist of Sandoval's telephone calls was that a "suspect" had been spotted in one of the trains and that railroad employees wanted Coulson's assistance in removing the suspect.

After arriving at the depot, Coulson spoke with Sandoval and then approached the head unit of a train where two railroad employees were waiting for him. The employees were the head brakeman and Robert Dean Tregallas, the engineer. Tregallas instructed Coulson to remove the suspect from the train.

This particular train had six engines or units on it. Coulson asked the trainmen for assistance in searching the units, but they were reluctant to help given the purpose of the search.

Accordingly, Coulson gave the head brakeman a sawed-off shotgun. Tregallas held an air hose, preparing to use it as a club if necessary.

Coulson proceeded to search the head unit, with the brakeman and Tregallas standing by in case the suspect attempted to flee.

Coulson found the first unit empty and then searched the second unit. Upon entering the unit, Coulson opened a panel door but found only train instruments inside. He opened another panel door and found a person seated and reading a book.

Coulson, with flashlight in hand, unsnapped his holster, ordered the suspect to get up, and asked him for identification. The suspect gave Coulson a social security card which had the name William R. Hall on it. This was one of the two men Coulson was searching for, and he told the suspect, whom he identified at trial as ap-

pellant, to raise his hands. Coulson then handcuffed the suspect and removed him from the train. He notified Dalhart, requested instructions, and was told to bring appellant to police headquarters in Dalhart.

It took Coulson thirty-seven minutes to drive appellant to the Dalhart Police Department. Coulson did not speak to appellant about the murder or anything of substance and did not tell appellant why he was arrested.

Halfway between Texline and Dalhart, Coulson was stopped by Deputy Little. Little got in Coulson's car and, after ascertaining that Coulson had not given the *Miranda*[4] warnings, read the warnings to appellant.

At the Dalhart police station, Coulson turned appellant over to Officer Brian Edward Smith. The Dalhart Police Department booking sheet reflects that appellant was booked into jail for trespassing. Smith testified that Coulson told him to book appellant on trespassing charges. Coulson denied making any such statement.

. At approximately 1:30 a.m. on the 27th, one-half hour after appellant's incarceration, Officer Bias removed him from his cell in order to take a statement. Bias gave appellant the *Miranda* warnings and after preliminary mention by Bias of the deceased's murder appellant confessed to stabbing the deceased to death in order to obtain his money.

Appellant signed a typewritten confession at 3:15 a.m. At approximately 5:00 p.m. on the 27th appellant was brought before the magistrate.

At the hearing on the motion to suppress appellant's confession, appellant contended that: (1) there was no probable cause for his arrest on murder charges; (2) even if there was probable cause, the arrest was warrantless and therefore improper; (3) Constable Coulson did not arrest appellant for criminal trespass; (4) if there was an arrest for criminal trespass it was an ille-

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 694 (1966).

gal pretext arrest; and (5) there were no significant intervening circumstances between appellant's arrest and confession.

The State countered that: (1) there was probable cause to arrest appellant for murder and Officer Bias had probable cause to believe appellant was about to escape, thus authorizing a warrantless arrest under Art. 14.04, V.A.C.C.P.; (2) Constable Coulson properly arrested appellant for an offense committed within his view, that is, criminal trespass; and (3) assuming an illegal arrest, there were significant intervening circumstances between arrest and confession, making the confession valid.

The trial court found that: (1) there was no probable cause to arrest appellant for murder; (2) Coulson did not arrest appellant for criminal trespass; (3) there were significant intervening circumstances between arrest and confession, chiefly the lack of interrogation of appellant, which rendered the confession admissible.

 We note initially that the trial court incorrectly found that Officer Bias lacked probable cause to arrest appellant. Bias relied on information from various eyewitnesses to events transpiring before and after the victim's death. Bias knew some of the eyewitnesses, knew at least one of them to be reliable, and stated that the others willingly came forward with information and gave their names. The eyewitnesses corroborated each other and in turn were corroborated by evidence found at the crime scene. Evidence found at the crime scene when added to information received from eyewitnesses proved to be especially damaging to appellant and Erwin.

Bias was told by various eyewitnesses that appellant and Erwin were seen at the murder site with the deceased on the afternoon he died. Bias was also told that appellant, Erwin, and the deceased were drinking Old Milwaukee beer and Mogen David wine. Old Milwaukee beer cans and wine bottles were found near the deceased's body.

Some of the vagrants reported that Erwin was wearing a blue jacket on the date of the offense. A blue jacket was found near the body of the deceased. Appellant and Erwin, according to the same informants, were carrying a large plastic bag with flowers on it. A bag fitting the same description was discovered near the deceased's body.

Appellant had on brown corduroy pants when seen with the deceased. Those pants belonged to the rescue mission and were reported missing by West. Bloodstained brown corduroy pants were found at the murder scene.

Finally, Bias was told of the incident occurring late Saturday night or early Sunday morning at the rescue mission in which appellant explained a skinned knuckle by saying that he "busted" a man who tried to take his wine and that the man would not do that again.

Under this set of facts probable cause clearly existed to arrest appellant and Erwin for the deceased's murder.

The only serious challenge to probable cause offered at trial by appellant was his assertion that his fellow vagrants were inherently unreliable. As noted above, the informants were either known to Bias or freely gave their names, and their stories were corroborative of information obtained at the crime scene. One of the informants was not a vagrant, but the director of the rescue mission. From the record, the informants appear to have been classic citizen-informers.

 Even though there was probable cause to arrest appellant for the deceased's murder, Bias was required to obtain an arrest warrant absent circumstances allowing him to proceed under the warrantless arrest statutes. See Arts. 14.01–14.04, V.A.C.C.P.

The State maintains that Bias had authority to arrest appellant without a warrant under Art. 14.04, supra, because he knew appellant was about to escape. Art. 14.04, supra, reads in pertinent part:

"Art. 14.04. When Felony Has Been Committed

"Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony

has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."

Nothing in the record indicates, however, that Bias knew or had been told of appellant's imminent escape. It will not satisfy Art. 14.04, supra, to say that Bias knew appellant was about to escape because he was a transient and transients by definition move about. The requirements of a finding that a felony offender is about to escape were succinctly put forth in *Rutherford v. State*, 104 Tex.Cr.R. 127, 283 S.W. 512, 514–515 (1926):

> "The purpose of the statute is to give effect to the guaranty of the Bill of Rights against the unreasonable seizure of the person, and to safeguard the public in the apprehension of offenders whose escape would be effected if a warrant is imperative. *It is the information that an escape is imminent which dispenses with the necessity of a warrant of arrest.* When it is shown to the officer in the manner prescribed in the statute that an offense has been committed by the person designated, *it is the duty of the officer to get a warrant, unless he knows or is advised that the offender is about to escape and there is no time within which to procure a warrant.*" (Emphasis added.)

■ Having determined that Officer Bias, the requesting officer, improperly failed to obtain a warrant, the next question is whether any event occurring after Deputy Little's radio request to Constable Coulson and before Coulson's arrest of appellant gave Coulson the legal right to arrest appellant. See *Woodward v. State*, 668 S.W.2d 337 (Tex.Cr.App.1982).

The State vigorously maintains that Coulson properly arrested appellant under Art. 14.01, supra, for an offense committed within his view, to wit—criminal trespass. Appellant contends that Coulson did not arrest him for criminal trespass. Both appellant and the State focus on Coulson's formal arrest of appellant, (that is, his handcuffing of appellant and notification to him that he was under arrest), and transfer to Dalhart. When this is the focus of inquiry it is clear that Coulson did not arrest appellant for anything other than the deceased's murder. Coulson repeatedly stated that he did not arrest appellant for trespass and no witness contradicted this testimony. Though there was a dispute as to what Coulson told Officer Smith about *booking* the appellant, this has no bearing on Coulson's arrest of appellant at the train depot.

Appellant, however, was detained by Coulson before he was handcuffed and informed of his arrest. Coulson *ordered* appellant to come up out of the compartment where he had been sitting. It was only *after* Coulson ordered appellant to get up and produce identification that Coulson determined appellant was one of the men he was searching for and advised him he was under arrest.

It is clear that once Coulson discovered appellant's identity, the collective law enforcement personnel working on the case had reason to believe appellant was in the process of escaping as that term is understood in the context of Art. 14.04, supra. See Woodward v. State, supra. See also, *King v. State*, 631 S.W.2d 486 (Tex.Cr.App. 1982), where it was reiterated that police officers do not have to be *told* a suspect is about to escape but can obtain such information on their own.[5] In the instant case, approximately thirty hours after the murder appellant was suspected of committing occurred, appellant was discovered in another town hiding on a train in a railroad yard. The record reveals that the train ran from Texline to Trinidad, Colorado and was being readied for departure. The foregoing facts suggest that appellant was in the process of escaping.

Officer Bias' failure to obtain a warrant does not inherently taint Coulson's subse-

---

**5.** Though Coulson at trial did not testify that he knew or thought appellant was in the process of escaping and did not at the time of arrest believe this to be of importance, his subjective articulation of the reasons for arresting appellant are irrelevant to our determination of the arrest's legality. *Townsley v. State*, 652 S.W.2d 791, 796 (Tex.Cr.App.1983).

quent discovery. In *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983), officers proceeded to appellant's house in order to arrest him for burglary. They did not have a warrant to arrest and there were no facts indicating a possible exception to the warrant requirement. Before officers ever entered appellant's house or arrested him, however, they saw him attempting to escape and *then* arrested him. We held that appellant's attempted escape dispensed with the necessity of officers obtaining a warrant for his arrest.

The problem in the case before us is that Coulson did not know it was *appellant* in the train and thus was not in a position to observe that *appellant* was in the process of escaping until *after* he detained appellant and demanded identification. A crucial aspect of the *Woodward* holding, which allowed in limited circumstances a cumulation of police information in order to establish probable cause, was that the receiving officer obtained relevant information on Woodward's possible involvement in the murder *before* he ever stopped him.

Unless Coulson's *initial detention* of appellant can be justified the arrest and subsequent confession are illegal because, as noted, appellant's identity was not discovered until after he was detained.

The unequivocal and uncontradicted testimony of Coulson as to how and why he was called to the train depot is as follows:

"Q. The only reason you arrested him is because Dalhart told you to.

"A. No, they didn't tell me to.

"Q. What did they tell you?

"A. They—this—Martha Sandoval called me and said that there was a suspect believed to be on that train. If he was on that train, well, take him off, that the crew wanted him off."

The dispatcher at the train depot called Coulson and asked him to remove somebody from the train whom the railroad yard did not want on the train. Those in charge of the railroad yard had a perfect right to ask Coulson to remove the unwanted guest. Though officials at the yard had not asked appellant to leave and been refused, (apparently because they were afraid to do so), the record reveals that a "No Trespassing on this Property" sign was located approximately a hundred feet from the unit upon which appellant was found.

V.T.C.A. Penal Code, Sec. 30.05 reads in pertinent part:

"30.05. Criminal Trespass

"(a) A person commits an offense if he enters or remains on property or in a building of another without effective consent and he:

"(1) had notice that the entry was forbidden; ...

" ...

"(b) For purposes of this section:

"(1) 'entry' means the intrusion of the entire body; and

"(2) 'notice' means:

" ...

"(c) a sign or signs posted on the property or at the entrance to the building, reasonably likely to come to the attention of intruders, indicating that entry is forbidden."

The railroad yard management called Coulson and asked him to remove a trespasser from the train. Thus, he had authority to be on the train and to remove appellant. It is of no great moment that Coulson had in all likelihood called Sandoval earlier in the day and told her to be on the lookout for a murder suspect.[6] Even in the absence of a warrant, an officer does not abridge the rights of a suspect by merely informing the citizenry that the suspect is implicated in a murder and at large. See *Woodward v. State*, supra, where the issuance of a "Be-on-the-Lookout" alarm from one police department to another did not infringe the defendant's Fourth Amendment rights.

---

6. The State in its brief implies that the discovery of an intruder on the train was an entirely fortuitous event, not preceded by any warning to the railroad employees that a killer was on the loose. Though the record is not crystal clear on this point, the only reasonable interpretation of it is that Coulson had informed various

In short, *for whatever reason it wanted to,* the railroad management had a right under the circumstances to have Coulson remove appellant from the train. Moreover, when Coulson *detained* appellant by ordering him to stand up, come forward, and produce identification, such detention was lawful since Coulson was in the process of investigating appellant's presence on the train at the behest of the railroad.

Appellant's contention that he was not guilty of criminal trespass, even if true, is irrelevant since the presence of the no trespassing sign gave Coulson probable cause to arrest. His contention that the sign was not visible from the train is likewise irrelevant since the statute only requires a reasonable likelihood that the sign be visible to intruders.

We are similarly unconvinced by appellant's argument that Coulson's arrest of appellant was a pretext arrest. To begin with, Coulson's ultimate arrest of appellant was at the direction of the Dalhart officers for murder. His initial trip to the trainyard was to apprehend and remove a trespasser, who might have been the suspect he was looking for. Even if Coulson had arrested appellant for trespassing *as a pretext in order to determine* if appellant was indeed the suspect he was looking for, this is allowable under our case law. See *Dodson v. State,* 646 S.W.2d 177 (Tex.Cr.App. 1983).

Finally, appellant's argument that the railroad regularly allowed others to trespass on its trains is both immaterial and misleading. It is immaterial because the railroad has the right to determine whom it does and does not want trespassing on its trains, and misleading because Tregallas testified that the railroad *never* allowed transients to ride in the engine units.

We conclude that appellant's confession was not the result of an illegal arrest. The

judgment of the Court of Appeals is reversed and the cause is remanded for consideration of appellant's other grounds of error.

CLINTON, Judge, dissenting.

*Dodson v. State,* 646 S.W.2d 177 (Tex.Cr. App.1983) examines a stop of a motor vehicle and concludes:

"We find that the record before us supports the trial court's finding that the officers stopped appellant's vehicle in a lawful manner and not upon a 'mere pretext.'"

*Id.,* at 185. That finding simply cannot be reasonably translated into what the majority opinion says about the detention of appellant in this cause, *viz:*

"Even if Coulson had arrested appellant for trespassing *as a pretext in order to determine* if appellant was indeed the suspect he was looking for, this is allowable under our case law." (p. ——)[1]

That gratuitous statement pales in significance to the respects in which the majority utilizes the unfortunate case of *Woodward v. State,* 668 S.W.2d 337 (Tex. Cr.App.1982). Rather than extending the two judge opinion in *Woodward,*[2] the Court should reject the notion that "collective law enforcement personnel" may reasonably believe some factual aspect of the law of arrest. That theory releases an arresting officer from responsibility for his actions, and enables an appellate court to make its own de novo determination as to their justification—just as is done here.

I respectfully dissent to further emasculation of constitutional and statutory provisions intended and designed for reasonable protection of our citizenry.

TEAGUE, Judge, dissenting.

Today, we witness the bastard child that two judges of this Court gave birth to in *Woodward v. State,* 668 S.W.2d 337 (Tex.

---

people throughout the day including Sandoval to be on the lookout for a murder suspect.

1. Emphasis added by Judge Tom Davis. All other emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

2. The opinion written on rehearing by Judge W.C. Davis in *Woodward* which is apparently the one relied on by Judge Tom Davis here, was joined only by Judge Miller. Thus, it cannot be even characterized as a "plurality" opinion.

Cr.App.1982),[1] reaching puberty. It will be most interesting to see what the bastard child looks like when it reaches full manhood.

Because I am unable to agree that this Court should buy the damaged and unrepairable merchandise the State is selling in this cause, namely, appellant's confession, and having found that the opinion authored by Chief Justice Reynolds of the Amarillo Court of Appeals has adequately discussed the issue, and correctly held that the trial court erred in admitting into evidence appellant's written confession, I adopt that opinion as my dissenting opinion. It is attached hereto.

However, under the law as it exists at this time, the erroneous admission into evidence of appellant's confession was trial error. Thus, the cause should be remanded to the trial court for retrial. Because the majority does not order the cause remanded to the trial court for retrial, I respectfully dissent.

APPENDIX

NO. 07–82–0110–CR

IN THE COURT OF APPEALS

FOR THE SEVENTH SUPREME JUDICIAL DISTRICT

OF TEXAS, AT AMARILLO

PANEL A

NOVEMBER 7, 1983

THOMAS J. BAIN, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

FROM THE DISTRICT COURT OF DALLAM COUNTY; 69TH JUDICIAL DISTRICT; NO. 2739; HONORABLE BILL SHEEHAN, JUDGE

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

Appellant Thomas J. Bain was convicted by a jury of the murder of James Langford. Punishment was assessed by the jury at confinement for life in the Texas Department of Corrections. Among appellant's twelve grounds of error are his first-ground contention that the trial court erred in admitting into evidence his written statement because it resulted from an illegal arrest, and his seventh-ground contention that the court erred in denying his motion for instructed verdict because there is no evidence, independent of his unlawfully-obtained confession, to support the conviction. These contentions, measured by the appellate record, must be sustained, making the other grounds of error immaterial and requiring a reversal and acquittal.

The record developed at the pre-trial hearing on appellant's motion to suppress his written statement reflects that the body of James Langford was discovered by Dalhart police officers at approximately 10:30 a.m. on Sunday, 26 April 1981, near a grain elevator in Dalhart. That Langford had been murdered was evidenced by numerous stab wounds to his chest, contusions and bruises about his face indicating that he had been severely beaten, and the binding of his hands with a leather shoelace to a piece of machinery associated with the grain elevator. The officers decided that Langford had been killed the preceding afternoon, but neither they nor the pathologist could establish the precise time of death.

Found at the scene, a site frequented by transients, were various personal effects, including a pair of blood-stained brown corduroy pants, a blue jacket and a beflowered plastic sack. When the investigation revealed no eyewitness to the murder, the officers, suspecting that the murder involved transients, turned their investigation toward Dalhart's "rescue mission," where transients are afforded lodging.

From diverse guests at the mission, most of whom are unidentified in the record, the

---

**1.** See fn. 2 of Judge Clinton's dissenting opinion that he filed in this cause.

officers learned that: one William Hall, who albeit using an alternate name at trial was determined to be appellant, and George Erwin, late residents of the mission, had not been seen there since the evening of April 25 or morning of April 26; Hall had cryptically commented the preceding day that he had "skinned" his knuckle warding off a man attempting to appropriate his and Erwin's wine, venturing further that the nameless miscreant "wouldn't do that again"; Hall and Erwin had been seen the preceding day in the company of Langford near the site where Langford's body later was discovered; and Hall had worn brown corduroy pants in the past and possessed a plastic sack with floral design. Thereupon, the officers deduced that Hall and Erwin were suspects in Langford's murder; however, the officers made no effort to secure an arrest warrant or otherwise consult a magistrate after their attempts to contact the district attorney and the county attorney proved unsuccessful.

Between 5:00 and 5:30 p.m. on April 26, Frank Coulson, the constable in Texline, some 36 miles from Dalhart, was informed of the Langford murder by Dallam County deputy sheriff E.H. Little, who alerted Coulson to apprehend appellant and Erwin, they being suspects in the murder, in the event they were, or either was, encountered. At approximately 10:30 p.m., after Coulson's survey of potential respite sites for the suspects proved fruitless, he was advised by a dispatcher at the Burlington Northern railroad yard in Texline that an unauthorized man was observed on one of the trains at the yard. With the assistance of two Burlington trainmen, one of whom was armed, Coulson, also armed, located appellant shortly after midnight behind a panel in one of the train engines, and removed him from the train without incident.

Coulson thereupon placed appellant under arrest, handcuffed him, and positioned him in his patrol car, without advising appellant of the offense(s) for which he had been arrested. Notifying Dalhart police of appellant's apprehension and requesting further instructions, Coulson was directed to transport appellant to police headquar-

ters in Dalhart. Appellant was fully compliant with authority, but volunteered nothing en route to Dalhart.

Midway between Texline and Dalhart, the Coulson patrol car was stopped by Deputy Little, who inquired of Coulson whether appellant had been informed of his *Miranda* [*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] rights. Coulson responded negatively and Little read the rights from a form, although appellant still was uninformed of the official reason for his arrest.

Upon his arrival at the Dalhart police station after a journey of 37 minutes duration, appellant was booked into jail for, at Coulson's direction, "trespassing," and again read his *Miranda* rights. Notwithstanding the booking, it was conceded by Coulson and the other participating officers that they never entertained an intention to actually prosecute appellant for trespassing. Indeed, Coulson and Robert Tregallas, one of the trainmen assisting in appellant's arrest, testified that the uninvited transporting of transients, a commonplace occurrence, customarily was benignly tolerated, and occasionally facilitated.

At approximately 1:30 a.m. on April 27, one-half hour after appellant's incarceration, Dalhart police captain Eddie Bias arrived "to take a statement from (appellant)." Bias acknowledged that he was not concerned in any measure with the "trespass," and intended at the outset to confine his inquiry to the murder. Removing appellant to his office, Bias also read appellant his *Miranda* warnings, and, after preliminary mention by Bias of Langford's murder, appellant volunteered his statement, which incriminated him and Erwin. During appellant's narrative, Bias took notes from which the statement was prepared. The statement was typed on a form which recited, in the heading, the admonishments prescribed by Tex. Code Crim. Pro. Ann. art. 38.22 § 2(a)(1)–(5), inclusive, (Vernon 1979), and, at both the heading and the bottom, a waiver of these enunciated rights. Appellant signed the typed state-

ment at 3:15 a.m. At approximately 5:00 p.m. on April 27, some 17 hours after his arrest and after an indictment was returned against him, appellant was brought before a magistrate.

Following the suppression hearing, the trial court made and filed findings of fact and conclusions of law. As material to the contentions dispositive of the appeal, the court included in its factual findings a finding that appellant's confession was freely and voluntarily made and is admissible, and concluded from all of its factual findings that: appellant's arrest was unauthorized because no probable cause existed for the issuance of a warrant for arrest; the connection between appellant's unauthorized arrest and his confession was sufficiently attenuated by intervening circumstances of two periods of time—*viz.*, one of approximately 35 minutes for the trip from Texline to Dalhart, and the other of approximately 30 minutes while appellant was in the jail cell pending Captain Bias' arrival—to permit the use of the statement at trial; and the confession taken from appellant was not obtained by the exploitation of an illegal arrest and should be admitted into evidence.

The trial evidence did not include the pre-trial evidence tending to connect appellant with the murder scene. Appellant's written statement was admitted into evidence over objections, among others, that it was not shown to have been freely and voluntarily given, and it was shown to be the product of an unlawful arrest in violation of appellant's rights under the Fourth and Fifth Amendments of the Constitution of the United States.

The court's finding that appellant's statement was freely and voluntarily made has been attacked by appellant with, and defended by the State in response to, a ground of error, but it is unnecessary to reach the ground and decide that issue. The court, as the sole fact finder at the pre-trial suppression hearing, concluded from its factual findings that appellant's arrest was unauthorized for lack of probable cause; the conclusion is supported by the record and not disputed by the State; and, therefore, the illegal arrest determination is conclusive. *Green v. State*, 615 S.W.2d 700, 707 (Tex.Cr.App.), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). Thus, even though the court found that appellant's statement met the Fifth Amendment standard of voluntariness, the finding is merely a threshold requirement for a Fourth Amendment analysis whether the State met its burden of establishing that the statement was not the product of appellant's illegal arrest and detention. *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *Green v. State, supra*, at 707–08.

The analysis of the recorded facts to determine whether a confession was obtained by exploitation of an illegal arrest is guided by the premier, albeit not exclusive, factors identified in *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975), re-affirmed in *Dunaway v. New York, supra*, 442 U.S. at 218, 99 S.Ct. at 2259, and accorded controlling effect in our jurisdiction. *See, e.g., Ussery v. State*, 651 S.W.2d 767, 771 (Tex.Cr.App. 1983); *Green v. State, supra*, at 708. Those factors are: (1) whether *Miranda* warnings were given; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct.

*Miranda* warnings were given to appellant; but, although the warnings are an important factor to be considered, they alone are not sufficient to deter or remedy a Fourth Amendment violation or break the causal connection between an illegal arrest and a confession. *Brown v. Illinois, supra*, 422 U.S. at 603, 95 S.Ct. 2261. The temporal proximity of appellant's unauthorized arrest and his confession was approximately sixty-five minutes, a lapse of time the trial court considered as two periods of time which, the court concluded, were intervening circumstances that sufficiently attenuated the connection between appellant's arrest and his confession to permit the admission of the confession into evi-

dence. In reality, the lapse of time is a factor distinct from the factor of intervening circumstances, and the court made no other finding of intervening circumstances; indeed, this record reveals no intervening circumstances of significance. It follows, then, that the trial court's conclusion that the connection between appellant's unauthorized arrest and his confession was sufficiently attenuated by the intervening lapse of sixty-five minutes has no basis in the record and is erroneous. *Accord, Hale v. Henderson,* 485 F.2d 266, 268 (6th Cir. 1973), *cert. denied,* 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974).

Resultantly, the time factor itself, in the absence of any significant intervening circumstances, admits that appellant's confession was produced by his illegal arrest and detention, and, therefore, was not shown to be admissible. *Brown v. Illinois, supra,* 422 U.S. at 604–05, 95 S.Ct. at 2262; *Ussery v. State, supra,* at 771; *Green v. State, supra,* at 709. This determination is enforced by the evidence that the purpose of the official conduct, a fourth-factor consideration, was patently investigatory in nature. The arrest was without probable cause and the reason given for it was specious; the detention obviously was for the extraction of the confession, the only evidence of appellant's culpability produced at trial. Even conceding that the officers acted in good faith, their good faith cannot justify a violation of the Fourth Amendment. *Dunaway v. New York, supra,* 442 U.S. at 218–19, 99 S.Ct. at 2259–60; *Brown v. Illinois, supra,* 422 U.S. at 605, 95 S.Ct. at 2262; *Ussery v. State, supra,* at 771; *Green v. State, supra,* at 708–09.

The factual situation in this appeal may be said to be a replica of the factual situations in *Dunaway v. New York, supra, Brown v. Illinois, supra, Ussery v. State, supra,* and *Green v. State, supra.* In each of those cases, as here, the defendant was arrested without probable cause, illegally detained for the purpose of investigation during a period of time—one hour in *Dunaway,* two hours in *Brown,* one hour to one and one-half hours in *Ussery,* and three and one-half hours in *Green*—until, without the intervention of any significant circumstance, a confession was obtained. In each of those cases, the court held, as we hold here, that the State failed to sustain its burden of showing the confession was admissible. Thus, the trial court's conclusion that the confession was not obtained by the exploitation of an illegal arrest is without support in the record, and the court erred in admitting appellant's statement into evidence before the jury.

Other than appellant's statement, the State adduced no evidence of probative force before the jury to establish his guilt of the offense charged. Given this posture of the record, there can be no further prosecution of appellant on the indictment. *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 24, 98 S.Ct. 2151, 2154, 57 L.Ed.2d 15 (1978).

Accordingly, the judgment of conviction is reversed and a judgment of acquittal is here rendered.

