**The STATE of Texas, Appellant,**

v.

**Antonio GARCIA, Appellee.**

**No. 08–89–00397–CR.**

Court of Appeals of Texas,
El Paso.

June 20, 1990.

Discretionary Review Granted Oct. 24,
1990.

Steve W. Simmons, Dist. Atty. of El Paso County, El Paso, for appellant.

David C. Guaderrama, El Paso County Public Defender, El Paso, for appellee.

Before FULLER, WOODARD and KOEHLER, JJ.

## OPINION

KOEHLER, Justice.

This is an appeal by the State from a pretrial order of the lower court sustaining a defense motion to suppress the fruits of a search resulting from a "pretext arrest". We reverse and remand.

On the afternoon of March 25, 1989, two uniformed El Paso police officers, Duran and Ruiz, were on routine patrol in their assigned district. They observed a tan Cadillac parked at the curb in front of 3717 Finley Street. The address was known to both officers as a frequent "shooting gallery" for drug offenders, as well as a frequent exchange point for stolen property. They had never seen this vehicle at or near the premises before. The officers were not in fact even aware of whether the driver of the vehicle was in that house. Nonetheless, their suspicions were aroused—albeit without sufficient reasonable, articulable facts to justify an investigative stop. They continued their patrol through the nearby streets. One hour later, they were again approaching the 3700 block of Finley, southbound on Latta Street. As they approached the intersection with Finley, they observed the Cadillac pass through the intersection in front of them, eastbound on Finley. Officer Duran testified that he started to follow the Cadillac from the intersection of Latta and Finley street and then saw the driver continue through the next intersection without stopping at a posted stop sign. Officer Ruiz' testimony was to the effect that they saw the stop sign violation from the first intersection and then turned to pursue the Cadillac. At any rate, Officer Duran pursued the Cadillac, employing both emergency lights and siren to signal the driver to stop. The Cadillac continued, south on Gateway South and then west on Paisano Drive. The Cadillac's progress was stopped by vehicles waiting for a red light on Paisano. Duran stopped to the left and rear of the Cadillac. He approached the driver's window on foot, knocked on the glass and asked the driver to lower the window. The Appellee (the driver and sole occupant of the Cadillac) did not comply despite repeated requests. Duran returned to the patrol vehicle and told Officer Ruiz to ask the drivers ahead of the Cadillac to remain in position, blocking Appellee's vehicle, while Duran called for back up. Ruiz walked ahead of the Cadillac. Appellee suddenly backed up even with the patrol vehicle and then accelerated forward at an angle toward Ruiz. Duran shouted a warning, drew his weapon and fired a shot into the passenger door on the Cadillac. Ruiz dodged out of the way. In moving forward, Appellee hooked his rear bumper on the front bumper of the patrol vehicle and began dragging the police unit down Paisano Drive. As the vehicles passed Ruiz, he dove into the passenger seat of the police unit. Duran pursued on foot initially, but was then given a ride by a civilian motorist. Appellee dragged the patrol vehicle approximately two hundred yards before stopping and fleeing on foot into an adjacent residential area. Duran resumed his foot pursuit. Appellee jumped a fence and entered the residence of an elderly woman who was outside. Duran pursued the Appellee inside and found him in a bathroom trying to dispose of several small plastic bags containing what appeared to be cocaine.

Due to the shooting aspect of the incident, the officers' supervisor, Sergeant Manuel Salcido, was called to the scene and advised of the foregoing events. He conducted a search of the vehicle and discovered four or five bindles of cocaine in a ceiling compartment and in a man's jacket in the trunk. The vehicle was impounded. Appellee was charged with the instant offense of possession of cocaine, as well as aggravated assault on a police officer (the vehicular assault on Officer Ruiz). No traffic citations were issued.

The lower court after deciding to suppress the evidence, entered findings of fact and conclusions of law, including a finding that the officers "after crossing Latta observed the automobile run a stop sign at Gateway South and Finley streets [sic]" and a conclusion that the initial attempt to stop the Appellee for a traffic violation was a "pretext stop," the real motivation being the officers' unsubstantiated suspicion that the Cadillac driver was involved in criminal activity at 3717 Finley and the vehicle might contain evidence of such activity.

■ At the outset, we note that the cases dealing with "pretext" stops by law enforcement personnel reflect two broad categories of situations. First are those involving administrative or regulatory

stops, not initially suggesting a suspicion that the subjects have committed a criminal act. See e.g. *Boyles v. State* (Tex.Crim. App. 69,743, Oct. 4, 1989, rehearing pending) (attachment of subject as material grand jury witness); *Meeks v. State*, 692 S.W.2d 504 (Tex.Crim.App.1985) (license and/or insurance check roadblocks). Second, there are those situations in which the subject is suspected of criminal activity and is either temporarily detained for investigation (upon reasonable articulable facts suggesting a need for such inquiry) or arrested (upon facts establishing probable cause). To attempt further precision in setting the parameters for our analysis, this second category, including the case before us, must be further subdivided into: (1) situations in which the criminal conduct triggering the stop is either not proven by the State or not believed by the fact finder; and (2) those situations in which officers with a preexisting suspicion directed toward the subject exploit some other, *actual* criminal act as a basis for stopping the subject and enhancing their opportunities to make observations relating to their initial (and perhaps primary) suspicion. Bearing such distinctions in mind should serve to avoid imprecise, overbroad use of the term "pretext".

As noted, the case before us falls into one or the other of the latter two situations. We must initially construe the lower court's findings of fact in order to determine the appropriate range of our appellate review. We cannot simply substitute our factual assessment for that of the lower court fact finder where there is a reasonable basis for his decision. *Johnson v. State*, 698 S.W.2d 154, 159 (Tex.Crim.App. 1985). Had the trial judge concluded, in assessing the credibility of Officers Duran and Ruiz, that the alleged stop sign violation did not in fact occur and that the "pretext" in this case consisted of a completely fabricated basis for attempting to stop the Appellee, we would be faced with a far different analysis. We would decline to overturn the trial judge's factual assessment and the suppression order would be valid, albeit, under basic Fourth Amendment doctrine, without resort to any so-called "pretext arrest" doctrine. In fact, however, we construe the lower court's recorded finding as accepting the stop sign violation as an actual occurrence, based upon the wording of Finding No. Four that the officers "observed the automobile run a stop sign at Gateway South and Finley streets [sic]." Thus, the issue before the Court is the viability of the so-called "pretext arrest" doctrine at its most extreme limit, suppressing evidence of one crime seized during the objectively proper scope of a detention or arrest based upon some other, arguably trivial offense when the officers had some preexisting suspicion of the greater offense and took advantage of the actual occurrence of the lesser offense to enhance their investigative opportunities.

In assessing the "pretext arrest" doctrine, upon which this suppression was based, we turn first to the supposed origins of the theory. That dubious distinction is generally accorded to *United States v. Lefkowitz*, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932). In that case, the deputy marshal and several prohibition agents, armed with only a warrant for the arrest of the defendant for violation of the National Prohibition Act, proceeded not only to effect the arrest but to search and seize papers found in the desks, cabinets and waste baskets for possible use as evidence of the defendant's guilt of the offense. In holding that the searches and seizures were violative of the defendant's rights under the Fourth and Fifth Amendments of the United States Constitution, Justice Butler closed with the dictum: "An arrest may not be used as a pretext to search for evidence." 285 U.S. at 467, 52 S.Ct. at 424, 76 L.Ed. at 884. Looking at the subsequent manipulation of that language, we marvel at the degree to which Justice Butler's "pretext" has been taken out of *Lefkowitz'* context. *Lefkowitz* did not present an arrest for one "trivial" offense by officers whose real motivation was to search for evidence of some other, more serious offense. There was only one offense involved in both the arrest and search, in both the objective conduct of the officers

and their subjective mental states. There was no pretext or subterfuge; there was an overt, admitted extension of the search zone, albeit impermissible, beyond the person of the arrestee.

Following in the footsteps of every proponent of the "pretext arrest" doctrine, Appellee traces the development of the doctrine from *Lefkowitz* and emphasizes that the case has not been overruled in the succeeding fifty-eight years. Why should it be? It does not stand for the "pretext arrest" doctrine currently urged by the Appellee and lingering on in various footnotes, dissents, rejected points of error and overruled opinions scattered across the intervening years. In fact, *Lefkowitz* is nothing more than a precursor to *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and was a seminal precedent for the search incident to arrest analysis in that later case.

In deciding where next to turn in tracing the mythogenesis of the "pretext arrest" doctrine, we understand how Heracles must have felt confronting the Hydra. Appellee's brief suggests reference to *Adair v. State*, 427 S.W.2d 67, 68–72 (Tex.Crim. App.1968), particularly the dissenting opinion by then-judge, now-retired Presiding Judge Onion. This is understandable since the majority affirmed the conviction, rightly or wrongly, on a search incident to arrest analysis, without engaging in a "Karnak-the-Magnificant" inquiry into the mind of the arresting officer. As initially pointed out by the dissent, the search could (should) have been invalidated as simply exceeding the proper scope of a search incident to arrest and not involving a plain view observation (i.e. the *real Lefkowitz*.) Obviously, having failed to convince the remainder of the court, save Judge Morrison, of that disposition, Judge Onion then plunged into a discussion of the "pretext arrest" doctrine. We have considered the primary authorities cited in the dissent in arriving at the stated conclusion. There is first a misinterpretation and misapplication of *Lefkowitz* as analyzed above. 427 S.W.2d at 71. The author then relies upon *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the case

which established Fourth Amendment standing on the basis of legitimate presence at the search premises. Pretext, subterfuge, exploitation, officer motivation are nowhere addressed in *Jones*. In fact, *Jones* involved the fruitful execution of a search warrant leading to defendant's arrest for the offense upon which the warrant turned—i.e. the opposite factual scenario from *Lefkowitz*, much less the later "pretext arrest" cases.

The dissent also relied upon *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925) (a pre-*Lefkowitz* opinion by the same Justice Butler) for the proposition that a "search fails because it is based upon a sham or pretext arrest." 427 S.W.2d at 71. Again, in *Agnello* there was only one suspected offense from start to finish—i.e. possession and delivery of cocaine. Agnello having been arrested upon delivery in one residence, other federal agents proceeded to his own distant residence, from which he had travelled immediately prior to the delivery, and searched it, sans warrant, seizing a can of cocaine. The search was appropriately invalidated without comment upon any "pretext arrest", sham or subterfuge.

Judge Onion also placed significant reliance upon quoted language from *Taglavore v. United States*, 291 F.2d 262, 265 (9th Cir.1961), referring to the effects and consequences of an arrest which is a "sham" or "front" for making a search. An Alaskan Territorial Police narcotics investigator and two fellow officers arrested a cab company owner at his place of business for narcotics violations, finding marihuana cigarettes on the premises at the time. The chief investigator then advised his cohorts that the defendant, a driver for the company, was also involved and would likely have marihuana on his person when found. He tendered them a rather unusual arrest warrant for two alleged traffic violations, which he himself had allegedly witnessed the night before, and told them to find and seize the defendant. They did so, alert from the outset to the defendant's anticipated possession of marihuana. Encountering the defendant on the street,

they advised him of the warrant. He placed something in his mouth and turned to flee. He was forcibly subdued and choked until the remnants of a marihuana cigarette could be removed from his mouth. The Ninth Circuit Court of Appeals reversed, invalidating the search as incident to a sham arrest. Implicit in the opinion, however, is a significant questioning of the credibility of the actual underlying traffic violations offered in support of the arrest. As noted above, that is a distinctly different type of "pretext" which may lead to suppression without resort to the so-called "pretext arrest" doctrine. Again, misplaced reliance by the Ninth Circuit on *Lefkowitz*, coupled with overbroad language, is the best that can be said for *Taglavore* (not to be interpreted as disagreement with the result). Even in this small trace of cases, what may be seen is the term "pretext", for precedential purposes, being treated as synonymous from case to case, without regard to the varying contexts in which it is applied.

Having dallied long enough on the false trail blazed by Judge Onion, we only briefly note his reliance on the then freshly penned *Amador–Gonzalez v. United States,* 391 F.2d 308 (5th Cir.1968). For those historically interested in a more detailed analysis of why that case and its short-lived progeny never did support the broadest reach of the so-called "pretext arrest" doctrine, we refer the reader to *United States v. Causey,* 834 F.2d 1179, 1182 n. 6, 1184–1185 (5th Cir.1987).

Appellee offers a number of Court of Criminal Appeals opinions as reflecting at least the theoretical existence of the doctrine. *Evers v. State,* 576 S.W.2d 46 (Tex. Crim.App.1978) (reckless driving); *Gutierrez v. State,* 502 S.W.2d 746 (Tex.Crim.App. 1973) (public intoxication); *McDonald v. State,* 415 S.W.2d 201 (Tex.Crim.App.1967) (vagrancy). In each, the Court of Criminal Appeals concluded that the record evidence amply supported a conclusion that the underlying arrest was not a "pretext", objectively or subjectively. To say that these conclusions support the existence of a "pretext arrest" doctrine is tantamount to saying that if a child concludes on three separate occasions that his parents, and not the tooth fairy, replaced the tooth under his pillow with silver, then the tooth fairy does exist. Of course, such "logic" does have its impact on some. *See Black v. State,* 739 S.W.2d 240 (Tex.Crim.App.1987). There, four members of the Court embraced the tooth fairy by citing *Evers, Gutierrez* and *McDonald* in continuing to propound the existence of the "pretext arrest" doctrine. In addition, the plurality cites (predictably) *Lefkowitz* for the proposition that "[A]n arrest for one crime is not permitted to be used as a pretext to search for evidence of another," 739 S.W.2d at 243, apparently overlooking the fact that *Lefkowitz* only involved one alleged offense from beginning to end.

Appellee cites *Black* as expressly overruling *Bain v. State,* 677 S.W.2d 51 (Tex. Crim.App.1984) and *Dodson v. State,* 646 S.W.2d 177 (Tex.Crim.App.1983). *Black,* 739 S.W.2d at 245 n. 2. *Dodson* and *Bain* stand for the proposition that if a valid stop is made for any reason (e.g. an actual offense) and the officers' objective conduct in response (i.e. search, questioning, transport, etc.) does not exceed the constitutional and statutory limits applicable to such a stop, additional subjective intentions, suspicions, or motivations on the part of the officers are irrelevant. In other words, although there may be other Fourth Amendment violations leading to suppression, there is no "pretext arrest" doctrine applicable. Even the initial panel decision in *Dodson,* which would have reversed and remanded, did not apply the "pretext arrest" doctrine on the basis of a valid traffic violation and resulting seizure being invalidated because of a preexisting, paramount suspicion on the part of the officer concerning an offense other than that upon which the stop was based. Rather, the panel simply concluded that the State had failed to prove that the underlying traffic stop was objectively valid. *See also Hooper v. State,* 533 S.W.2d 762 (Tex.Crim.App.1976); *Hall v. State,* 488 S.W.2d 788 (Tex.Crim. App.1973). As previously noted, if that be the case, or if having heard the evidence, the fact finder believes the underlying stop

offense did not actually occur, basic Fourth Amendment doctrine would lead to suppression without superfluous reference to "pretext".

Returning, however, to Appellee's reliance on *Black*, we note that Judge Miller's opinion did not effectively overrule *Bain* and *Dodson*, being merely a plurality statement. Judge White concurred only in the result, Judges McCormick and Davis dissenting in toto and Presiding Judge Onion and Judge Teague specifically dissenting to the suggested overruling of the noted cases. Thus, those two cases are alive, if not well and safely intact, hence the length of this opinion. See *Gordon v. State*, 767 S.W.2d 866 (Tex.App.—Eastland 1989, PDRG). Most recently, we have been presented with *Boyles v. State* (Tex.Crim. App. 69,743, Oct. 4, 1989, rehearing pending) in which a majority footnote states that the "pretext arrest" doctrine is still viable, citing *Black* in the face of *Causey*. The result in *Boyles* would be more appropriately reached by sole reliance on the conclusion that the attempted attachment of the defendant as a grand jury witness was defective, regardless of any pretextual motivation on the part of law enforcement personnel.

A multitude of cases make reference to the so-called "pretext arrest" doctrine. The cases noted herein, however, are a representative sampling, and a more detailed assessment of other cases will not improve the lineage of this illegitimate offspring of *Lefkowitz*. That case is invariably cited, misinterpreted and misapplied by the proponents of the doctrine with great persistence. Beyond that, the authority for the doctrine's existence consists of rejected points of error, dissents and overruled opinions. The doctrine was and is without authoritative support.

If lack of legal authority be insufficient for its final demise, we suggest that the doctrine is also illogical and unworkable as a guiding principle to be followed by the officers on the street or the courts in trial. What if the legislature sought to embody the doctrine in statutory form:

If an officer performs a valid arrest for one criminal violation, conducts a search incident to such arrest which is proper in scope, and in the course of such search discovers evidence of some other crime, that evidence is admissible in court as long as:

(a) The officer did not already suspect and wish to investigate the other offense; and

(b) The stop offense is not trivial in comparison to the other offense suspected.

The present proponents of the doctrine would undoubtedly fight for first position in line to challenge such a statute as unconstitutionally vague. How can an officer apply such a standard on the street? Verging on metaphysics, we question whether any *actual* offense committed in the officer's view can ever be deemed trivial in relation to a suspected offense in which there is not even a sufficient basis for a *Terry* stop. If trailing a suspected murderer, must the officer ignore all violations trivial in comparison to murder? What degree of difference is indicated by the characterization of "trivial"? Perhaps we could assign a point value to every offense, indicating relative significance. Then, if an officer is maintaining surveillance of a suspect, he can look up the applicable point value of such offense. As the surveillance continues and the officer observes the suspect committing additional penal offenses, he can keep a running total of the point value of these offenses. Suppression may then be avoided if he refrains from stopping the suspect until the aggregate "stop points" equal or exceed the "suspicion points."

What interest is served by promoting the "pretext arrest" doctrine? Looking to the dissent in *Adair*, Judge Onion seemed concerned that traffic violations are the most common context in which the argument occurs and noted that it is difficult for any citizen to adhere fully and faithfully to traffic regulations at all times. 427 S.W.2d at 71. So what—in perpetuating the myth of the "pretext arrest" doctrine are we allowing criminal defendants to employ the exclusionary rule in order to vicariously

protect the general public's right to drive badly, or with expired inspection stickers and license plates, or with defective equipment? If "defensive driving" is the order of the day, it would only be enhanced by finally laying the "pretext arrest" doctrine to rest. Even if we were to encourage better driving practices only among those who are transporting contraband, fleeing from other crimes, unlawfully carrying weapons or bearing evidence of other crimes, our roads would be considerably safer.

Returning to the general categories of situations in which the "pretext arrest" doctrine typically arises, we find the theory unnecessary and irrelevant to the constitutional and statutory interests involved. In the case of stops based upon some offense, such as a traffic violation, committed in the officer's view, the officer's prior suspicions and subjective intent, as well as his objective conduct, are relevant in terms of the credibility of the allegation that the stop offense actually occurred. If the fact finder concludes that such stop offense did not occur, suppression is in order without resort to any so-called "pretext arrest" doctrine. Any characterization of the officer's conduct as "pretextual" is superfluously and hyperbolically descriptive, but not legally dispositive. On the other hand, if the fact finder concludes that the stop offense did occur and the officer does not objectively violate some other Fourth Amendment or statutory restriction, e.g. *Lefkowitz/Chimel*, then his earlier additional suspicions and motivations are irrelevant. The same dichotomy exists with regard to administrative stops, not involved in the record before us. Proponents of the "pretext arrest" doctrine seek to translate the subjective mental state of the officer into an objective legal standard by which they can circumvent a fact-finding process in which they apparently have little faith. In doing so, they erode an admirable process from within.

 We conclude that, given the actual occurrence of the stop sign violation, the officers' actions leading to the arrest, search and seizure were proper, regardless

of their preexisting suspicions and desire for an opportunity to stop the Appellee's vehicle. Both at trial and on appeal, the parties have focused upon the "pretext" stop alone. Little attention has been given to that increment of the incident in which police entered the Cadillac and seized the alleged cocaine. This aspect of the case has only been addressed in the context of the "pretext arrest" argument, as further evidence of improper subjective motivation on the part of the police. Potential complaints separately challenging this facet of the seizure are not before the Court. We note, however, two additional concepts which seem to apply to this scenario. In *Matienza v. State*, 699 S.W.2d 626 (Tex. App.—Dallas 1985, PDRR), the Fifth Court of Appeals concluded that it was not necessary to reach the issue of the propriety of the initial stop since the subject reacted by allegedly drawing a pistol and pointing it at the arresting officer. The significance of this intervening offense overshadowed the issue of the propriety of the initial attempted stop, was sufficient to attenuate any initial taint, and justified the subsequent arrest, search incident to arrest and seizure of contraband from the subject's person. That rationale is equally applicable to Appellee's conduct. *See also* Tex.Penal Code Ann. sec. 9.31(c) and (d) (Vernon 1974) and sec. 38.03(a) and (b) (Vernon 1989). The lower court's finding that the officers had time to secure a search warrant for the Cadillac is irrelevant. The vehicle was subject to impoundment and inventory, without warrant, incidental to Appellee's arrest. It was also subject to outright seizure as the instrumentality of the offenses of aggravated assault on Officer Ruiz and/or resisting arrest with force. Under either approach, the cocaine found in the vehicle would have been properly subject to discovery and seizure.

We conclude that the trial judge erred as a matter of law in suppressing the seized contraband on the theory that the valid attempted traffic stop was but a pretext for investigation of the officers' other preexisting, unsubstantiated suspicions. Points of Error Nos. One and Two are sustained.

The suppression order of the lower court is hereby vacated and the cause is remanded to the trial court for further proceedings consistent with this opinion.